**In the Matter of the Honorable Lloyd G. BRIGGS, Respondent.**

No. 61742.

Supreme Court of Missouri, En Banc.

March 20, 1980.

James M. Smith, St. Louis, for Commission.

George E. Schaaf, Clayton, James R. Robison, Sikeston, for respondent.

PER CURIAM.

In this disciplinary proceeding, the Commission on Retirement, Removal and Discipline (Commission) under authority of Mo. Const., art. V, § 24 and Supreme Court Rule 12 recommends Respondent's removal from the office of Circuit Judge, 33rd Judicial Circuit of Missouri.

The Commission made extensive findings of fact and conclusions of law as to numerous acts of judicial misconduct. Respondent was found guilty of charges 4, 5A, C, D, and E involving political contributions and partisan political activity violative of the Code of Judicial Conduct, Supreme Court Rule 2, Canons 1, 2, 7 A(2) and 7 A(4). The Commission also found respondent guilty of charges 6A, 10A, 10B, 10D, 10E, 10G, 10H, and 10J for failing to diligently and competently discharge the administrative responsibilities incumbent upon him as a judicial officer. In this regard it was determined that respondent's improper dismissal of criminal actions, his failure to follow the law when granting hardship driving privileges as well as his failure to properly supervise employees under his control, constituted violations of Judicial Canons 1, 2, 3 B(1) and 3 B(2) of Rule 2. Additionally, the Commission found respondent improperly used court property, personnel and facilities for political and personal purposes and that he made statements improperly casting the judiciary and other public officials in an unfavorable light. We need not recount the testimony pertaining to each charge as the record clearly demonstrates (1) respondent's improper political activities and (2) his failure to diligently fulfill the duties of administering his court, warrant removal; hence, the discussion shall be directed principally to those areas. In our independent evaluation of the record and review of the Commission's findings and recommendations we give substantial consideration and due deference to the Commission's ability to judge the credibility of witnesses appearing before it. We do not review those charges which the Commission adjudged respondent not guilty.

■ Respondent served as Scott County Magistrate from January, 1971 until his appointment to the Circuit bench by Governor Teasdale on March 6, 1979, to fill a vacancy occasioned by the retirement of the incumbent Circuit Judge. Prior to his appointment, respondent had twice been notified by the Commission of complaints against him. First, by a letter of November 22, 1977 and second, by the formal notice (under Rule 12.08(a)) dated December 21, 1978 in which the Commission advised respondent he was under investigation concerning specified acts of misconduct alleged in the notice.

Respondent's activities first came to the Commission's attention in 1977 by a newspaper article asserting that the Governor consulted with Briggs concerning "patronage appointments in Southeast Missouri." The complaint was made that he was "the patronage chief of the 10th Congressional District." This led to the Commission's letter of November 22, 1977 stating it would proceed with an investigation of the charges, and invited any statement respondent might wish to make regarding these complaints. Answering, Briggs by letter of December 6, 1977, conceded he had spoken to the Governor from time to time but stated,

> I have never attempted to influence the Governor in any way with respect to any of his appointments, nor have I ever approached the Governor on behalf of anyone to secure an appointment or position.

By this arrant representation Lloyd Briggs misled the Commission for he was in fact deeply involved in improper political activities and had repeatedly approached the Governor and others to secure "appointment[s]" and "position[s]." However the Commission, relying on his statement, notified respondent by its letter of March 14, 1978 as follows:

> Since you state [in your letter] that you are consulted only occasionally by Governor Teasdale concerning possible appointees and not on a regular patronage basis . . . we are willing to accept your statement, and on that basis close our file.

The Commission accepted respondent's assertion at face value that his conduct constituted de minimis violations, if any, of the Canons of Judicial Conduct.

In the months that followed (March to December, 1978) new controversy pertaining to Briggs' judicial conduct surfaced, re-

sulting in the formal notice of December 21, 1978, by which the Commission advised respondent of its formal investigation of eight specified charges against him. On March 6, 1979, respondent was appointed to the office of Circuit Judge. Thereafter on May 7, 1979, the Commission instituted these proceedings requiring that Briggs answer the charges brought.

By the original and amended notice, ten charges (several with numerous sub-parts) of misconduct under the Code of Judicial Conduct were directed to respondent.[1] Allegations of improper political activity were contained in charges 4 and 5. Charge 4 accused that while Judge of the Magistrate Court, Briggs made contributions to the political campaign of Governor Joseph Teasdale. Charge 5 accused respondent of "arranging and/or attending Democratic political meetings and/or fund raisers, soliciting campaign funds, making recommendations for appointments to state jobs and other political appointments to Governor Joseph Teasdale, his staff, and other state officers or legislators." In addition it was alleged that Briggs held himself out as political counselor for matters relating to southeast Missouri, commonly known as the "Bootheel," and of taking part in the Governor's campaign.

With respect to these charges, the Commission found that respondent, while Judge of the Scott County Magistrate Court, directly or indirectly contributed to the political campaign of the Governor, including a $200 check drawn by respondent and other contributions totaling $1,300 consisting of checks drawn by his wife from a joint bank account in which respondent's judicial paychecks were deposited. Further, it found that respondent undertook by various means to influence gubernatorial and other Executive Department appointments, involved himself in arranging "and/or" attending political meetings and fund raisers for the gubernatorial candidate, that he held himself out as a political counselor for

Southeast Missouri, and took part in the gubernatorial campaign. The record abundantly supports those findings and abounds with instances demonstrating respondent's judicial conduct was violative of the Canons.

In 1976, Lloyd Briggs was not a candidate for public office, having been elected as Magistrate of Scott County to a four year term in 1974. Nevertheless, sometime prior to the primary election of August, 1976, he made a $200 direct contribution to the campaign of the gubernatorial candidate. By his brief, respondent characterized this as a gift to a friend, yet he admitted the check was made payable to "the Joe Teasdale Campaign fund." Shortly before a fund raiser for Governor-elect Teasdale, known as the Bootheel Ball held in Sikeston, respondent's wife Juanita, made a contribution of $300 to Teasdale and in March of 1979 made an additional contribution, in the amount of $1,000 directly to the Governor's campaign. Juanita Briggs explained that she had been appointed state license fee agent on April 5, 1977, and that she considered the $1,000 contribution in March, 1979, as an "obligation" for fee agents of the State of Missouri. All these contributions were paid from the joint bank account on the First National Bank of Sikeston in the name of Lloyd Briggs and Juanita Briggs. Although respondent claimed he did not know of the third contribution until August, 1979, the time of the Commission hearings, there can be no question that his judicial salary was commingled with other funds in the joint account and it is apparent the Commission simply did not believe any of the contributions to have been the independent act of Mrs. Briggs or regard as credible Briggs' statements that he was unaware of his wife's check to Teasdale on this account. The closely woven business and political aspects of their lives shown in the record negates his assertion that he knew nothing of this check until his wife mentioned it one evening during the hearing in August last year. Under the facts

---

1. Charge 10 was added by amendment during the hearing. The challenge to that amendment will be discussed later in this opinion.

before us Briggs may not avoid responsibility for these "indirect" contributions made by his wife from their joint account. Such contributions were facially improper and constituted violations of Canons 1, 2, 7 A(2) and 7 A(4) absent a showing of sufficient exculpatory and mitigating circumstances. Giving due deference to the Commission's determination of the witnesses' credibility, nothing here vindicates respondent's actions. The three contributions totaling $1,500 were violative of Canon 7 A(4) which prohibits a judge from "engag[ing] in any other [than specified in the Canons] political activity except on behalf of measures to improve the law, the legal system, or the administration of justice."

Sometime in the summer of 1976 respondent, while Magistrate Judge of Scott County, suggested to David Mann, an attorney in Sikeston[2] that Mann become involved in the gubernatorial campaign. This led to Mann's chairmanship of a fund raiser near the time of the August primary at the Holiday Inn in Sikeston referred to as the "Tea for Teasdale." According to Mann, he consulted on how to conduct the fund raiser and received counsel on the logistics, as well as the guest list, from Briggs. After the November election, respondent became involved in at least an advisory role for an additional fund raiser known as the Bootheel Ball, also chaired by Mann, from which some $40,000 was raised for Teasdale. Mann testified that he sought Briggs' advice in these matters. Four witnesses corroborated respondent's admission that he was present at the organizational meetings or planning sessions for this event and some of those meetings were held at respondent's wife's restaurant in Sikeston. As related by Bill Lewis, later Director of Agricultural Development for the State of Missouri, Briggs participated in organizational meetings for this post-election event held at the Sikeston Armory apparently in late November or December, 1976. This was followed by another fund raiser and victory celebration in Kansas City at the Muehlebach Hotel in December of that year. Respondent, joining several of his friends, flew in a private plane to Kansas City and took with him some $40,000 in checks and drafts which were the proceeds of the Sikeston Bootheel Ball. He delivered the envelope with these funds at the Kansas City victory dinner to Robert Sniezek, an officer of the Teasdale committee who handled campaign funds. Respondent admitted that Charles Stamps, one of the principals of the Bootheel Ball asked him to deliver the checks and drafts to Sniezek in Kansas City and respondent complied with this request, fully aware that he was carrying the proceeds from the political fund raiser earlier that month. Sniezek, after describing the scene at the Sikeston group's hotel room where delivery of the funds occurred, stated that Briggs "certainly was pleased that the Bootheel was able to raise the money," and quoted Briggs as follows: "This is us and how do you like us guys, Sniez? We don't do bad down in the Bootheel, do we?"

Belying his assertion that he was only peripherally involved in the activities described above, respondent in September of 1977 boasted to Gerald Ortbals, a member of Governor Teasdale's staff that he, Briggs, was responsible for raising $40,000 for the Governor's election and that he had personally conveyed that amount to the Governor. In addition respondent told Ortbals "He had been the moving force in the Governor's election in the Bootheel and . . . [that] he and the Governor had reached an agreement that he would be the clearinghouse, so to speak, for any appointments or employment that took place that affected that particular area of the state." The Governor had introduced Briggs to Ortbals "as a friend and long-time supporter and as the man who [the Governor] wanted to clear and screen all appointments and employments in southeast Missouri before they were made."[3] Subsequently Ortbals

---

2. Briggs was appointed Circuit Judge March 6, 1979, and eight days later Mann was appointed by the Governor as Associate Circuit Judge (formerly the magistracy) of Scott County to fill the opening occasioned by the Briggs' elevation to the Circuit bench.

3. Gerald Ortbals joined the Governor's staff on September 10, 1977 and was named Chief of Staff in November of 1977. He left the staff on January 4, 1978.

learned that respondent was indeed the patronage clearinghouse for gubernatorial appointments in the Bootheel when he was repeatedly contacted by respondent on such matters. Ortbals explained that during the four months between September of 1977 and January, 1978, respondent had between 15 and 20 contacts with him, and that most of the information regarding appointments went into the Executive Office paper shredder. Respondent requested that his communications be destroyed and Ortbals honored these requests.

A short time earlier respondent wrote a letter to Jack Runyan, Director of Agriculture in the Teasdale Administration, inviting Runyan to confer with him on matters relating to the "Bootheel" as they affected the Teasdale Administration. In this letter of September 7, 1977, (as in his communications to Ortbals) Briggs requested that the conversations and correspondence be treated as a confidence. Specifically the letter states:

I, therefore, wish to again extend an invitation to counsel with you in matters relating to the Bootheel as they regard the Teasdale Administration. My only request is you keep conversations and correspondence confidential. It goes without saying that to repeat a confidential conversation or communication demonstrates a gross deficiency in social graces.

Respondent closed with this: "the Bootheel is an area that should be nurtured."

Gerald Ortbals testified that they conferred several times about the possibility of holding a fund raising event for the Governor in Southeast Missouri and as Ortbals explained, Briggs "anticipated that he would be the person in charge of that particular event in terms of orchestrating the format for the particular fund raiser in terms of having his wife implement the actual fundraising event."

Early in the summer of 1978 Tony Heckemeyer, an attorney in Sikeston, was called in to Judge Briggs' chambers at the Benton Court House where he proposed that Heckemeyer undertake a fundraiser for Teasdale. Respondent told him that the names of invitees for the fundraiser could be supplied from his (respondent's) file, then in the possession of David Mann. Later, having heard nothing further concerning the fundraiser, Heckemeyer went by Briggs' house to discuss it with him.

There can be no doubt respondent exercised his apparent prerogative relative to political appointments in Southeast Missouri. Numerous witnesses from the Executive Department testified to his continuing efforts to secure appointments for various individuals. The record discloses a running stream of contacts by respondent with the Governor's and other Executive Department Offices which stand in stark relief against the assertion in his December 6, 1977 letter to the Commission that he had never attempted to influence the Governor in any way with respect to appointments "nor have I ever approached the Governor on behalf of anyone to secure an appointment or position." This gross misstatement was refuted by the testimony and numerous exhibits, including the following letter of May 12, 1977:

Hon. Joseph P. Teasdale
Governor's Office
Jefferson City, Missouri 65101
RE: SUBJECT NO. I—SOME UNFINISHED MATTERS
NO. II—A BOOTHEEL PLAN FOUR YEARS HENCE
Dear Joe:

Number one, we have three people who can get whatever endorsement necessary, and need to be employed. Joe, these are the last things I am kind of hung out on:

John Heeb—218 Heeb Street, Chaffee, Missouri

He has already talked to LePage. He needs a $11,000.00 or $12,000.00 job. You will see the connection with subject matter in number two.

Beth Mann—301 N. New Madrid, Sikeston, Missouri (LePage)

This is David's wife and she certainly needs the appointment of eye examiner, surely there is a Bond appointee she can replace in this area.

Paul Crader—Oran, Missouri (Runyan) This is a kinsman of Dwight Crader, a very early contributor and a member of your council. I told Dwight last summer that Paul could get a job.

Governor, help me with these. I will be embarrassed if these folks don't get a job. Number two, there is a very highly regarded Doctor who's name I have called your attention to before, Max A. Heeb. He is well received in all quarters and is a member of the Sikeston School Board. He always leads the ticket. He would be an ideal man to head any effort in the Bootheel. Will you place him on some kind of board so that we can nuture [sic] him. He is blue chip material.

We need not discord [sic] our old friends, but we need to expand and pyramid and get into the big leagues.

No reply necessary

Very truly yours,

This letter was followed by his "memo" of May 25, 1977 to Robert Sniezek in the Governor's Office relative to several job applicants, as well as plans for maximizing the Governor's media exposure on a trip to Southeast Missouri by announcing a grant to a local college. Pertinent portions of that memo are:

MEMO TO: Robert Snizek [sic]—Governor's Office

Three Job Applicants:

I. Paul Crader—Department of Agriculture

I have an interview for him with Hurst on Thursday next.

II. John Dale Heeb—Department of Revenue

He has already been interviewed and needs a job ten, eleven or twelve thousand dollars a year.

III. Beth Mann—Who wants to be appointed an eye examiner in this area. We have a little bit of a problem here, because the eye examiner that now works Scott and Mississippi Counties is a real good Democrat. Perhaps we could get Beth employment in Scott and some other county or rearrange the work areas for these people. I will be glad to discuss it.

IV. Dr. Max A. Heeb—Sikeston Physician, very prominent doctor needs to be placed on some board whereby he can be nurtured. He has got some desire to help improve our political system. He feels a need to participate. This guy would look very good heading any of Teasdale's endeavors in Southeast Missouri. He is known all over the State and would have access to many surgeons all over the State. Let's keep him in mind.

He then proposed a "Teasdale Building" for Three Rivers College in Poplar Bluff adducing:

The Governor is to appear before the planning group in Poplar Bluff on June 30, 1977. In the event this project titilates [sic] him it would be a wonderful time to make the announcement. It would give ample time to get adequate coverage, television, radio, etc.

Now, Bob, if the Governor likes this, it looks to me like a good deal, with maximum return. Let me know and there are four or five people that need to fly up there and have a short visit with him . . . Let me hear from you. Jerry Briggs.

Another letter addressed to the Governor, summarized a telephone conversation between respondent and the Governor. Respondent discussed three appointments, the first of whom he described as "a popping good businessman," and stated he "was always available with his pocketbook open and I suppose he has given you about $1,000. Some of this we laughingly refer to as early-early money." Further he suggested that the Governor should have "Jim Kolb submit this name to C. H. Parsons, . . . for ratification," and added, "C. H. has already been wired." Another young lady whose father he described as "active in the labor movement" was represented by

Briggs to the Governor as needing a job as "sales tax collector, caseworker, eye examiner, etc." Additionally, Briggs outlined the favors a future "Bootheel" visitor would seek from the Governor as follows: "I am going to give you [Governor] a thumb nail sketch of what I think he wants to talk to you about in this order: (a) He wants deposits for his bank. (b) He wants to change his bank from federal to state. (c) He wants you to urge the University of Missouri to inaugurate some type of program for education of out-state doctors."

Members of the Executive Department testified to respondent's incessant efforts to secure appointments. These included Jack Runyan, Director of Agriculture, who explained that he received a letter of April 14, 1977 from Briggs regarding job recommendations and a letter of September 7, 1977 relating to a discussion of "Bootheel" matters and reminding Runyan to post the Governor's name on the face of the Department's Sikeston Grain Inspection Office.

The Director of Revenue, James LePage, described an early spring 1977 meeting in his office when Judge and Mrs. Briggs discussed the appointment of Mrs. Briggs to the fee office in Sikeston. Shortly thereafter Mrs. Briggs was so appointed, and on May 27, 1977 respondent by his letter of that date complained to the Director that a few weeks earlier a supervisor from the Director's office had been visiting the Sikeston license office then operated by Mrs. Briggs and, seeing the Governor's picture on display, stated to Mrs. Briggs that she had only seen one such picture. In his letter to LePage, Briggs stated:

[H]ere it is damn near June and this woman had only seen one picture [in the various offices]. That's reprehensible. Thousands of people have been through these fee agents offices that could have seen Joe Teasdale's picture. We have overlooked that opportunity.

Let's get these pictures hung up in the fee offices. If you are short of money, let me know, I will get a fund together to buy them. Very truly yours, Lloyd G. Briggs.

Mr. James R. Kolb, Legislative Liaison for Governor Teasdale, stated he had had two conversations with respondent regarding appointments and that by his letter of August 2, 1978, he thanked respondent for his letter of July 31, 1978, recommending a gentleman from Kennett for appointment to the "Education Commission of the States."

Mr. Paul A. Hurst, former personnel director of the Department of Agriculture, testified that he discussed appointments with respondent and that he had thanked respondent by letter for particular recommendations. Mr. Bill Lewis, Director of Agricultural Development, one of those accompanying Briggs to the victory celebration at the Muehlebach Hotel in December, 1976, stated that Briggs worked with him on the campaign and afterwards Briggs talked to the Governor regarding Lewis' appointment to the Department of Agriculture. Clifford Faddis, of the Teasdale staff, received recommendations from respondent for gubernatorial appointments to the Governor's Economic Advisory Council. By a letter to Faddis of May 12, 1978, respondent recommended four names for council membership and each recommendation was couched in political terms with little or no reference to the nominees' qualification for office.

Several employees who worked in the magistrate office described their observations of political activities in the office, and the extent to which they were involved. Though the employees participated in different ways and times and none to the same extent, the activities included typing political letters, making political phone calls, and typing political letters for Mrs. Briggs. Respondent acknowledged that his correspondence (assembled in the various exhibits) to the Governor and others in the administration were perhaps in violation of the Canons. He also admitted that most of the assembled letters were prepared in the Magistrate Clerk's Office by court personnel. As respondent stated, "In retrospect, when I look at them all together I can see where the question can be raised that I was

[in violation]. I recognize that." He added, however, that he had no idea the matter would come to public light, describing his attitude on the matter this way: "[Y]ou see, the letters I had written I thought were in-house letters for the eyes of me and the Governor."

From this evidence it is clear respondent repeatedly breached the letter and spirit of Canons 1, 2, 7 A(2), and 7 A(4). These canons are not merely aspirational, instead they are principally designed to guarantee the independence and impartiality of the judiciary. It is of paramount importance that both in practice and in the public mind, our judicial processes be neutral, fair and free from improper influences. Respondent's excessive involvement in partisan political activities is inconsistent with the preservation of these values and as such mandate his removal from office.

Respondent was also charged with (1) failing to supervise his staff, (2) failing to maintain court records and conduct court proceedings in a manner which would maintain professional competence and judicial administration and facilitate the performance of administrative responsibilities and (3) failing to require his staff to observe the same standards of fidelity and diligence that apply to the judge in violation of Canons 3 B(1) and 3 B(2). Numerous acts and omissions of respondent justify the Commission's finding of misconduct in this area. It seems apparent respondent's shortcomings in these particulars stemmed from his infrequent attendance at the Magistrate Court in Benton. He admitted he was present in court only on Wednesdays and infrequently on other occasions for the conduct of preliminary hearings or similar matters during the years 1976 to 1978. Further it was conceded that Jackie Lasters, Clerk of the Magistrate ·Court, took endless liberties with the office of magistrate which we believe could not have happened had she been properly supervised and controlled. An example of this is found in the illegal grant of a limited driving privilege to one Zack Hastings, a convicted felon and brother-in-law of the clerk. Apparently during the absence or without the knowledge of

respondent, the clerk concocted a file with the necessary documentation including the preparation of a formal court order granting limited driving privileges to Hastings which was subsequently mailed to the Department of Revenue. In so doing she affixed a rubber stamp bearing a facsimile of respondent's signature to the order. While respondent protested that he did not authorize such use of the rubber stamp, other employees testified that the stamp was customarily kept on Lasters' desk. In addition, the clerk created a bogus docket page for this case, complete with recitations of facts and a detailed "order" and "judgment" of the court. Incredibly, when respondent was informed of the order he took no action except to ask that a certified copy of the order be obtained from the Department of Revenue. Apparently he wanted to know what she had sent from the office. The spurious order and docket sheet remain a part of the record in the Magistrate Court of Scott County for he did nothing to correct this wrong. The false order was "entered" in March, 1978, and back-dated to March 1, 1978. While respondent asserts he knew nothing of the matter (in effect admitting he made no check of his records during the seven months that followed) he was told of it by the deputy clerk in late October or early November, 1978. Shortly thereafter he fired Jackie Lasters.

With respect to charge 10J, the Commission found respondent by improper supervision (or with his knowledge) permitted the clerk, Jackie Lasters, to continue as an employee in the magistrate court when it was general knowledge that she was reducing traffic tickets without authority. The unrefuted testimony was that Jackie Lasters altered many traffic tickets. A former prosecutor testified Jackie Lasters' habits included "continuing cases," and "she fixed tickets . . ." This practice of Ms. Lasters was so widespread that for three or four weeks after she was fired, people came to the office with traffic tickets and asked for "Jackie." Though respondent claims to have had no knowledge of Ms. Lasters' improper activities prior to the time she was

terminated, this contention lacks credibility inasmuch as Deputy Clerk Klipfel testified that Briggs admitted he had "some warning" of Lasters' conduct in this regard. Further, if respondent's claims were true, it demonstrates his failure to exercise supervision and control of his staff, a situation readily resulting from the fact he was seldom in his office more than one day a week. The preponderance of the evidence showed that bonds were set, "tickets" amended, continuances and limited driving privileges granted by court personnel in a manner not authorized by respondent and the Commission properly concluded that this resulted from the lack of supervision by respondent and as such constituted a violation of Canons 3 B(1) and 3 B(2). In addition, a number of magistrate files were examined and evidence presented concerning irregularities in docket entries which did not accurately reflect what transpired in his court. Typical of this problem were a number of case records which stated "after hearing evidence and proof adduced," when in fact no hearing occurred and no proof was adduced in the case. In others (for example limited driver proceedings) although the record would recite a form entry that evidence was heard, the applicants often were not sworn. As explained by an attorney for one such party, "I'm not sure we always have hearings in our court," and that respondent had accepted his word as to an applicant's driving record without a copy of the driving record from the Department of Revenue. The record demonstrates a want of diligent discharge of administrative responsibilities and adequate supervision or control of the magistrate staff. While there were additional findings we need not lengthen this opinion with a discussion of other acts of misconduct found by the Commission.

During the nine day hearing (extending over a fifteen day period from August 6, 1979–August 20, 1979) a prodigious volume of evidence was adduced from more than fifty witnesses and on the eighth day of the hearing it became apparent to the Commission that an amendment to the charges was necessary so that the pleadings would be brought into conformance with the proof. As discussed above, the proof revealed irregularities in the administration of respondent's court contrary to Canons 3 B(1) and 3 B(2). Considering this testimony the Commission determined there was probable cause for an amended charge and under the authority of Rule 12.18 directed that the notice be amended by the addition of charge 10 on the morning of the eighth day of hearing. Respondent objected to the amendment as indefinite and uncertain and this objection was sustained. The proposed amendment was clarified and then allowed. Additionally, respondent objected to the amendment contending he had inadequate time to prepare and that he was denied "due process." This objection was not well taken for a number of reasons. Much of the proof relative to the charge had been developed from the testimony of Jackie Lasters who testified on the first and fourth days of the hearing. In response to protracted cross-examination of Lasters by respondent on the first day, the Commission subpoenaed many court records from respondent's office. Those records which served as the basis for much of the later amendment to the charges, were admitted into evidence by stipulation of Thursday, August 9 and on that fourth day of the proceedings Jackie Lasters was recalled and extensively examined concerning those records. On that same day respondent requested a continuance to examine the voluminous records, which included Exhibits 63–91, and at the conclusion of the fifth day's hearing the cause was adjourned for a six day period affording all concerned ample opportunity to peruse those exhibits. In addition, when the amendment (charge 10) was added, the Commission offered respondent additional time or continuance. After some discussion counsel for respondent stated that while "we won't [sic] feel we need more time, we may need to call additional witnesses." Whereupon the Commission's Chairman inquired "are you ready to proceed now?" and the answer was "Yes, sir." The Commission was in recess for six days after Mrs. Lasters' testimony. Respondent had abundant time to review the files she had identified and discussed in her testimony. An additional continuance was offered

and refused. Hence, there was no want of due process.

Most of the questionable conduct is alleged to have occurred while respondent was serving in his prior judicial role as magistrate of Scott County. In his brief, respondent contends that only acts committed in the capacity of circuit judge may be the basis for discipline in the office of circuit judge.

In the past there was some division of authority as to whether conduct of a judge in a prior term provided the basis for disciplinary action, however it is now generally accepted that unless the enabling provision expressly limits the court's removal power to grounds arising within the term of office, the judge may be removed or disciplined for such conduct. *Power of Court to Remove or Suspend Judge*, 53 A.L.R.3d 882, § 18, p. 929. *Sarisohn v. Appellate Division of Supreme Court*, 21 N.Y.2d 36, 286 N.Y. S.2d 255, 233 N.E.2d 276 (1967), involved a situation virtually the same as that before us. Much of the questionable conduct occurred while Sarisohn was a justice of the peace prior to becoming a district judge. Holding that the district judge was subject to discipline for acts committed while serving as a justice of the peace, the New York Court of Appeals stated, "It would be an unseemly and unsound distinction with respect to a matter affecting general character and fitness to immunize a judge from his prior misconduct as a judge of lesser or higher rank." 286 N.Y.S.2d at 262, 233 N.E.2d at 281. Though we have not faced the precise question before, we decided a similar issue when a judge was charged by the Missouri Bar Advisory Committee with misconduct as an attorney prior to becoming a judge. See *In re Mills*, 539 S.W.2d 447 (Mo. banc 1976). While in that case it was considered important that a "license to practice law" is one of the qualifications necessary for holding the office of judge and suspension of the license to practice would render such person lacking in necessary qualifications for holding the office our court said: "[H]e [Mills] may not take refuge in a judicial office from discipline for prior misconduct, the effect of which would be removal of one of his qualifica-

tions for occupying the refuge. To permit the use of a judicial office as such a sanctuary would be a travesty upon justice." *Id.* at 450. The rationale of the *Sarisohn* court is fully compatible with our reasoning in *Mills* and we hold that any misconduct of respondent in the prior office of magistrate may properly be the basis for his removal from the office of circuit judge, particularly where as here, much of the alleged misconduct may well have been the key that opened the door to the higher office.

Finally, respondent claims removal from office an excessive penalty in light of the evidence adduced. We cannot agree. Here removal is appropriate and we need but compare the facts of the case sub judice with *In re Corning*, 538 S.W.2d 46 (Mo. banc 1976).

It is accordingly ordered, adjudged and decreed by this Court that respondent, Lloyd G. Briggs, be and is hereby removed from office as Circuit Judge of the 33rd Judicial Circuit of Missouri.

All concur.