603 So.2d 494 (1992)
In re CODE OF JUDICIAL CONDUCT (CANONS 1, 2, AND 7A(1)(b)).
No. 79592.
Supreme Court of Florida.
July 23, 1992.
Rehearing Denied August 31, 1992.
*495 Bruce Rogow of Bruce S. Rogow, P.A., Ft. Lauderdale, Robert M. Montgomery, Jr. of Montgomery & Larmoyeux, James K. Green, West Palm Beach, Nina E. Vinik, Miami, and Edna L. Caruso, West Palm Beach, on behalf of Honorable Hugh S. Glickstein and American Civil Liberties Union of Florida, for petitioners.
Roy T. Rhodes, General Counsel, Judicial Qualifications Com'n, Tallahassee, Ernest A. Sellers of Airth, Seller, Lewis & Prevatt, Live Oak, and Lauri Waldman Ross, Miami, on behalf of Joseph J. Reiter, et al., respondents.
McDONALD, Justice.
Hugh Glickstein, a judge of the Fourth District Court of Appeal, filed a complaint in circuit court asking that canons 1, 2, and 7 A(1)(b) of the Florida Code of Judicial Conduct be declared unconstitutional. We ordered the case transferred to this Court pursuant to article V, section 2(a), Florida Constitution, and have jurisdiction. Art. V, §§ 2(a), 12, Fla. Const. We hold that the challenged canons are constitutional and dismiss the complaint.
In late October 1990 Judge Glickstein wrote an open letter to the electors of Florida urging them to vote for the retention of Chief Justice Leander Shaw. Several newspapers published the letter. On July 19, 1991 the Florida Judicial Qualifications Commission (JQC) formally charged Judge Glickstein with violating canons 1, 2, and 7 A(1)(b) by publicly endorsing a candidate for public office.[1] In August Judge Glickstein filed his complaint against the individual members of the JQC, alleging that the canons unconstitutionally deprived him of his freedom of speech. The JQC members filed numerous motions to dismiss, but the circuit court refused to do so. In December 1991 the JQC petitioned this Court for a writ of prohibition to stop further circuit court action on Judge Glickstein's complaint. This Court did not grant prohibition,[2] but transferred the circuit court case here to determine the constitutionality of the complained-about canons.
This Court adopted the Florida Code of Judicial Conduct almost twenty years ago. In re Code of Judicial Conduct, 281 So.2d 21 (Fla. 1973). According to the preface to the code, the code "states the standards that judges should observe, and these are mandatory unless otherwise indicated." Canon 1 states: "A judge should uphold the integrity and independence of the judiciary."[3] *496 To that end, canon 2 states: "A judge should avoid impropriety and the appearance of impropriety in all his activities."[4] To further the purposes of canons 1 and 2, canon 7 restricts political activity by judges and states: "A judge should refrain from political activity inappropriate to his judicial office." Canon 7 A spells out what is not appropriate political activity and specifically provides that judges should not "publicly endorse a candidate for public office." Canon 7 A(1)(b).[5] Several Florida judges have been reprimanded for violating canon 7 A. E.g., In re Turner, 573 So.2d 1 (Fla. 1990); In re Kay, 508 So.2d 329 (Fla. 1987);[6]In re Pratt, 508 So.2d 8 (Fla. 1987);[7]In re DeFoor, 494 So.2d 1121 (Fla. 1986). Most other jurisdictions regulate the political activities of their judges through provisions similar, or identical, to canon 7 A, and their courts have disciplined judges who engage in prohibited political activities. E.g., Morial v. Judiciary Comm'n, 565 F.2d 295 (5th Cir.1977), cert. denied, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978); In re Davis, 249 Ga. 428, 291 S.E.2d 547 (1982); In re Katic, 549 N.E.2d 1039 (Ind. 1990); In re Troy, 364 Mass. 15, 306 N.E.2d 203 (1973); In re Briggs, 595 S.W.2d 270 (Mo. 1980); Office of Disciplinary Counsel v. Capers, 15 Ohio St.3d 122, 472 N.E.2d 1073 (1984); In re Kaiser, 111 Wash.2d 275, 759 P.2d 392 (1988); see Connealy v. Walsh, 412 F. Supp. 146 (W.D.Mo. 1976) (court employee discharged for endorsing political candidate); In re Randolph, 101 N.J. 425, 502 A.2d 533 (restricted political activity of court attendant), cert. denied, 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986); In re Gaulkin, 69 N.J. 185, 351 A.2d 740 (1976) (judges must not involve themselves in the political activities of nonjudicial spouses).
The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). Thus, the Court has stated that "speech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). Expressing one's opinion about who should serve in a public office, as Judge Glickstein did, is political speech that falls within the protection of the First Amendment. That amendment, however, "does not comprehend the right to speak on any subject at any time." American Communications *497 Ass'n v. Douds, 339 U.S. 382, 394, 70 S.Ct. 674, 682, 94 L.Ed. 925 (1950).
Regulations that attempt "to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." Broadrick v. Oklahoma, 413 U.S. 601, 611-12, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). In other words, restrictions that have a substantial impact on First Amendment rights "are subject to exacting scrutiny" and "must be supported by a compelling governmental interest and must be narrowly drawn so as to involve no more infringement than is necessary." Winn-Dixie Stores, Inc. v. State, 408 So.2d 211, 212 (Fla. 1981). The realm of protected speech and conduct can be narrower for public employees than for the general public because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). A balance must be struck between the interests of a public employee "in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. Applying these principles, the Supreme Court has held that a teacher may not be fired for publicly expressing his opinion on how a school board spends its funds, Pickering, but has also held that Congress can restrict federal employees' political activities and that the states can restrict their employees' political activities. United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); Broadrick.
Maintaining the impartiality, the independence from political influence, and the public image of the judiciary as impartial and independent is a compelling governmental interest. E.g., Morial; Gaulkin; Kaiser. The necessity for an independent, impartial judiciary was recognized early in our nation's history:
This independence of the judges is equally requisite to guard the Constitution and the rights of individuals from the effects of those ill humors, which the arts of designing men or the influence of particular conjunctures sometimes disseminate among the people themselves; and which, though they speedily give place to better information and more deliberate reflection, have a tendency, in the meantime, to occasion dangerous innovations in the government, and serious oppressions of the minor party in the community.
The Federalist no. 78, at 231 (Alexander Hamilton) (Roy P. Fairfield ed., 2d ed. 1986). Hamilton went on to explain why the judiciary must be independent:
The benefits of the integrity and moderation of the judiciary have already been felt in more States than one; and though they may have displeased those whose sinister expectations they may have disappointed, they must have commanded the esteem and applause of all the virtuous and disinterested. Considerate men of every description ought to prize whatever will tend to beget or fortify that temper in courts; as no man can be sure that he may not be tomorrow the victim of a spirit of injustice by which he may be a gainer today. And every man must now feel that the inevitable tendency of such a spirit is to sap the foundations of public and private confidence, and to introduce in its stead universal distrust and distress.
Id. at 232.
To protect the independence of the judiciary, the right of judges to engage in political activity has been restricted. Judges and judicial employees are treated differently from other public servants because there is "something special in the judicial role." Allan Ashman et al., Judges in an Age of Mistrust, 54 Tul.L.Rev. 382, 414 (1980). In the words of one commentator:
The great mass of the people think that judges are different, that their special *498 relationship to the law is what makes them different, that they are not merely political authorities, weighing and balancing interests, but legal authorities, guided and restrained by the law. It is this conviction, more than anything else, which compels the people to obey orders of the court. It is this conviction, more than anything else, which gives judges a power and authority that so resembles political power that they mistakenly think they are political people. Paradoxical as it may seem, to the extent that judges are seen as political rather than judicial, to that extent they lose their authority and the power they now have to induce obedience to their orders. If judges are stripped of the robes of the law  or if, in the foolish pursuit of political power, they strip themselves of the robes of the law  the people will cease to accept the authority of court decisions, law enforcement officers will be less ready to enforce court orders, legislators will be more ready to curb judicial powers, and the judges will wonder where their power went.
Any judge will have more power by seeming to be completely judicial and not at all political. A judge who would be truly powerful, who would be a significant force and influence for good in the American polity, must not only seem but actually be wholly judicial. This has always been the secret of politically successful American judges.
Robert A. Goldwin, Comments to Chapter 1, in The Judiciary in a Democratic Society 19-20 (Leonard J. Theberge ed., 1979). This Court and others have recognized that judges hold a unique position in our society that warrants distinguishing them and what they can do from the general citizenry.[8] In In re LaMotte, 341 So.2d 513, 517 (Fla. 1977), this Court removed a judge from office and stated: "Judges should be held to even stricter ethical standards [than attorneys] because in the nature of things even more rectitude and uprightness is expected of them." Cf. Cone v. Cone, 68 So.2d 886, 888 (Fla. 1953) ("From the time he is clothed with judicial authority he is a marked man... . The judiciary is the capstone of our democracy but it will be so no longer than its deportment warrants.") The Massachusetts Supreme Judicial Court concluded that, although "a judge is entitled to lead his own private life free from unwarranted intrusion," because he is subject to constant scrutiny "he must adhere to standards of probity and propriety higher than those deemed acceptable for others." In re Troy, 364 Mass. 15, 306 N.E.2d 203, 235 (Mass. 1973). The court supported this statement by stating: "More is expected of him and, since he is a judge, rightfully so. A judge should weigh this before he accepts his office." Id. (emphasis supplied). The New Jersey Supreme Court has long prohibited judicial involvement in both partisan and nonpartisan politics and has reaffirmed "in the strongest possible terms its scrupulous adherence to the stern policy of absolute noninvolvement in politics of members of the New Jersey judiciary  a policy adamantly enforced" and "largely responsible for the high respect in which that system is held." Gaulkin, 351 A.2d at 743; Randolph.
We agree with those sentiments and hold that, not only do the challenged canons meet a compelling state interest, they also are drawn and interpreted narrowly enough to be constitutional. Judge Glickstein argues that canon 7 A(1)(b)'s blanket prohibition on endorsing candidates simply goes too far and is overbroad. Canon 7 A regulates political activity in an even-handed and neutral manner. All Florida judges are subject to canon 7 A(1)(b)'s absolute prohibition. All, however, including Judge Glickstein, are free to speak their minds privately, to believe in whatever particular ideas they choose, to comment on a judge's attributes so long as such comments cannot reasonably be construed as a public endorsement of or opposition to a judicial candidate, to engage in political activity *499 under canon 7 A(4) "on behalf of measures to improve the law, the legal system, or the administration of justice," and, most importantly, to vote for whomever they choose.
The canons impose high standards and a heavy burden on those persons who accept judicial office. They are standards measuring fitness for judicial office and include tests of behavior relating to integrity and propriety that preclude judges from taking actions that the general public can engage in without consequence. In balancing our compelling interest in an independent, impartial judiciary against a judge's right to take a political stand that might destroy that independence and impartiality, we must conclude that the former outweighs the latter. Therefore, we hold canons 1, 2, and 7 A(1)(b) constitutional and deny and dismiss Judge Glickstein's complaint. In doing so we do not pass upon the merits of the proceedings pending before the Judicial Qualifications Commission relative to Judge Glickstein.
It is so ordered.
OVERTON, GRIMES and HARDING, JJ., concur.
BARKETT, C.J., concurs specially with an opinion.
KOGAN, J., dissents with an opinion.
SHAW, J., recused.
BARKETT, Chief Justice, specially concurring.
The majority opinion simply stands for the proposition that a canon prohibiting a judge from publicly endorsing a candidate for public office is constitutional. I concur because I believe that preserving the impartiality and independence of the judiciary is a sufficiently compelling governmental interest to justify this restriction. That impartiality might be compromised if candidates are permitted to vie for judges' endorsements. Because the majority refrains from addressing the application of this principle to this case in its present posture, I do not address it at this time.
KOGAN, Justice, dissenting.
I concur in the majority's assessment of what a judge ought to do. However, there is a wide gap between what a judge should do and what a judge must do, and in this case the right of free speech clearly falls within that gap. Although the majority generally agrees with this sentiment, we part company on the conclusion that a compelling state interest exists in this case. I find no compelling state interest here and conclude that the canons as construed by the majority violate Judge Glickstein's free-speech rights. Indeed, if the canons are construed to have any application to the conduct at issue here, then they are patently overbroad and hence unconstitutional.
Here, the majority takes as its "compelling" interest a list of abstractions so poorly related to the present case as to be utterly beside the point  "the impartiality, the independence from political influence, and the public image of the judiciary as impartial and independent." Majority op. at 6. No one would disagree with this list. Judges ought to be impartial and independent. But the question that the majority simply does not answer is how these values have been impugned in the present case.
In point of fact, the majority opinion does not quote from and has ignored the content of what Judge Glickstein said in his letters. Below, I will quote verbatim Judge Glickstein's letters. In his March 26, 1990, letter,[9] Judge Glickstein made the following comments:
I write, first, to extend my congratulations and best wishes. A nice article from Leesburg, where I spoke on behalf of Children's Services Councils, as well as editorials, are enclosed for your scrap-book, attesting to your historic election as Chief Justice.
My second reason for writing is the Orlando article and my distress at your drawing, again, single-issue partisan attackers *500 who would use courthouses to look solely after the popular will.
As a native Floridian, and as a lawyer and judge for 35 years, I have lived long enough to see, finally, not only a black chief justice, but also a supreme court which is philosophically representative of minorities and those of us who have been  because of sex, race or religion  put down or left out.
The irony of the present attack upon you is that your concern for children has been established by your recent commitment to speak out on children's issues as chief justice, by your having been the first court liaison with the guardian ad litem program, and by your being the first justice to be a member of The Florida Bar's Committee for the Legal Needs of Children and its Commission for Children. Your door has been open for the unmet needs of Florida's children.
I am confident that the people of Florida have the good sense to turn a deaf ear to your attackers. The first amendment guarantees your attackers their right to speak out. Our common sense gives us the right not to listen.
In his October 25, 1990, letter, Judge Glickstein made the following remarks:
I am voting "YES" to retain Chief Justice Leander Shaw for the following reasons:
1. We not only have an articulate, bright, black chief justice, but a supreme court that is sensitive to those of us left out or put down because of race, religion or sex. If it ain't broke, don't fix it!
2. He has grown with the high office of justice, and makes valid, worthwhile contributions to the administration of justice.
3. As a child advocate, in his off-the-bench time, he has been a member of The Florida Bar's Committee for the Legal Needs of Children and its recently created Children's Commission. As such, he has assured the rest of us who work in child advocacy in our off-the-bench time that he will be a vocal, active supporter to fill children's needs. Very few Floridians are aware that he has served as the court's liaison to the state's guardian ad litem program, which program one child advocate has recognized as the most complete help a child can receive.
4. A jurist must be evaluated by his or her overall performance. Are their decisions informed and sensitive? I may disagree with him on an individual decision, but that is not the test. His decisions are informed and sensitive.
5. I am learning, at this late stage, to light candles instead of cursing the darkness; to build, not to blame; to feel confident, not to fear; to feel good, not to fuss. The attacks on Chief Justice Shaw, I perceive, are cursing the darkness in a society too preoccupied with blame, fear and guilt. As has been said, that dog won't hunt.
Did these letters suggest a lack of impartiality? I cannot in good conscience say yes, because to do so misconceives the very nature of the judicial office. For there to be a genuine lack of impartiality, the statements Judge Glickstein made in these letters must in some way show that he cannot decide cases that come before him fairly and without prejudice. Nothing in these letters fits that description. This is not a letter soliciting money from lawyers in exchange for favorable rulings or asking Justice Shaw to always affirm Judge Glickstein's opinions whenever they are brought to this Court. Indeed, these letters do not make any statement relevant to future court cases at all.
All Judge Glickstein did was give his assessment of Chief Justice Shaw's performance in office and the need to retain him there. Support for the Shaw merit retention campaign does not imply that Judge Glickstein has subscribed to a particular philosophy, abandoned fairness, or prejudged cases. The only conceivable basis for assuming some lack of impartiality would be if, for some reason, Chief Justice Shaw were to become a litigant in the Fourth District Court of Appeal where Judge Glickstein now sits. And even that problem easily would be resolved by Judge Glickstein recusing himself, just as all of us routinely recuse ourselves when close *501 friends are litigants in our courts. In sum, Judge Glickstein's publicized admiration for the Chief Justice in no sense equates to prejudice on particular cases.
Did Judge Glickstein's letter suggest a lack of independence from political influence? Again, I am at a loss. Judge Glickstein's comments did not align him with any partisan cause. He did not announce that his judicial actions henceforth will reflect the Democratic Party Platform or fall lockstep with the principles of Reagan Republicanism. Judge Glickstein has not placed himself under the mentorship of politicians or sold his office to a political cabal.
To the contrary, he announced his belief that Chief Justice Shaw is worthy of being retained in office during a merit retention election. To suggest that this shows a lack of political independence is simply without foundation. Merit retention by law is nonpartisan and Chief Justice Shaw clearly was not aligned with any particular party. As a matter of public record, the campaign's support and opposition cut across party lines.
Nor do I find anything in Judge Glickstein's letters otherwise indicating a lack of political independence. To say so is incorrect, because in one blow it condemns as "partisan" the ideals Judge Glickstein espoused in his letters  a commitment to racial and ethnic equality, a commitment to end gender bias, a commitment to better the condition of Florida's children, and a commitment to judicial independence.
We do well to remember that a commitment to racial, ethnic, and gender equality is the law of Florida. E.g., §§ 760.01-.51, Fla. Stat. (1991). Indeed, Judge Glickstein's comments are entirely in harmony with the recent reports issued by the Supreme Court Racial and Ethnic Bias Study Commission, an organization that we ourselves created as an organ of this Court. I cannot conceive that a judge ever should be disciplined for advocating adherence to the law of this state and the policy of our judicial system.
Likewise, the clear public policy of Florida is to better the lot of our children. See § 39.001(2)(b), Fla. Stat. (1991). If a commitment to helping the children violates the canons of ethics, then this Court is as serious a transgressor as Judge Glickstein. For example, the Court itself created the Florida Guardian Ad Litem Program, with a mission of assisting children caught up in the legal system. In addition, the imprimatur of this Court was placed on The Florida Supreme Court Gender Bias Study Commission Final Report (1990), and large sections of this document deal with the problems of runaways and children involved in custody and child-support disputes.
Judge Glickstein's letters also include a resounding endorsement of judicial independence from political influence. According to Judge Glickstein, judges should be evaluated on how informed and sensitive their opinions are, not on whether someone or some group disagrees with a particular opinion. In condemning Judge Glickstein's statements in this regard, the majority thus appears to condemn the very reasoning underlying the majority opinion itself. In effect, the majority finds that Judge Glickstein abdicated judicial independence by advocating an independent judiciary.
Did Judge Glickstein's actions create a public image that he lacked independence and impartiality as a judge? Once more, I cannot say yes. All he said was that he supported Chief Justice Shaw out of concern for racial, ethnic, and gender equality; out of concern for Florida's children; and out of concern for judicial independence. It simply is not reasonable to conclude that these sentiments created an image of a judge who lacked independence and impartiality. If anything, Judge Glickstein's letters convey the opposite impression.
There may be some circumstances under which a compelling interest could be established to restrict the speech of judges, but this plainly is not that case. I do not believe the majority itself would have condemned Judge Glickstein had he made his statements in any context other than an election. Florida judges routinely advocate upholding the law, helping children, and maintaining judicial independence  as this Court itself repeatedly has done. But if *502 Judge Glickstein had a right to make these statements in other contexts, I simply cannot see that this right evaporates in the context of a merit retention campaign.[10] Free speech is not so fickle a privilege. To my mind, a judge can be censured only for making statements or advocating positions that would be improper whether or not made in the context of an election, such as announcing prejudice regarding certain types of cases or inviting bribes.
Finally, the actions taken by Judge Glickstein here unquestionably are far less serious than when judges take large campaign contributions from the attorneys who practice in their courts. This is a practice that clearly creates both an appearance and likelihood of impropriety, yet we have held it to be entirely proper. MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332 (Fla. 1990). This Court now has placed itself in the awkward position of allowing judges to raise tens of thousands of dollars from attorneys who appear before them, but those same judges cannot even publicly speak their minds regarding who ought to be a justice of the Florida Supreme Court.
I conclude that the canons cannot constitutionally be construed to reach the conduct at issue here. To do so violates Judge Glickstein's right of free speech because, under any reasonable interpretation of the record before us, there cannot be a compelling state interest justifying this investigation in this case. In sum, if the canons apply here, then they are unconstitutionally overbroad. I would remand to the circuit court with directions that all appropriate relief be granted to prohibit the Judicial Qualifications Commission from proceeding with this cause.
NOTES
[1] The JQC has stayed proceeding against Judge Glickstein until our resolution of this matter.
[2] We dismissed the petition for writ of prohibition. Reiter v. Gross, 599 So.2d 1275 (Fla. 1992).
[3] The text of canon 1 reads as follows:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
[4] The text of canon 2 reads as follows:

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
B. A judge should not allow his personal relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or authorize others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.
As stated in the commentary to canon 2:
Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
[5] In 1990 the American Bar Association adopted a complete revision of its Model Code of Judicial Conduct. In the new code canon 7 A(1)(b) has been renumbered as canon 5 A(1)(b) and amended to provide that judges or judicial candidates shall not "publicly endorse or publicly oppose another candidate for public office." Extending the canon's proscription to publicly opposing a candidate has no effect on this case.
[6] The JQC charged Judges Pratt and Kay with, among other things, violating canon 7A by endorsing each other. We adopted the JQC's findings that they improperly gave the appearance of endorsing each other, but without citation to canon 7A.
[7] See n. 6, supra.
[8] This case, therefore, is factually distinguishable from other cases dealing with the First Amendment rights of nonjudicial public servants or employees. E.g., Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Goffer v. Marbury, 956 F.2d 1045 (11th Cir.1992).
[9] The March 26, 1990, letter apparently was not the actual basis of the proposed censure here, but the Judicial Qualifications Commission is using it to buttress the charges arising from the October 25, 1990, letter, reproduced below. I therefore include the text of both letters.
[10] In fact, if Judge Glickstein had merely praised Justice Shaw without indicating any opinion regarding the merit retention election, we would not be confronting this case today. For example, Judge Glickstein clearly would have had a right to appear in a television interview and advocate adherence to equal-rights laws, the bettering of conditions for children, and judicial impartiality. He even could have praised Justice Shaw and the Court for their adherence to these same principles, as he did in his letter. The majority apparently finds fault with Judge Glickstein solely because he coupled the following sentence with these other remarks: "I am voting "YES" to retain Chief Justice Leander Shaw for the following reasons... ." I do not see how this single statement brings down the wall of protection afforded by the guarantee of free speech.