TOWNSHIP OF PISCATAWAY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. CONCERNED CITIZENS FOR CHRONIC PSYCHIATRIC ADULTS, A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY, THE STATE OF NEW JERSEY, AND THE COMMISSIONER OF THE DEPARTMENT OF HUMAN SERVICES OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 1, 1985—Decided May 2, 1985.

Before Judges KING, DEIGHAN and BILDER.

*Phillip Lewis Paley* argued the cause for appellant (*Kirsten, Friedman & Cherin,* attorneys; *Phillip Lewis Paley* and *Lionel J. Frank,* on the brief).

*John M. Baron* argued the cause for respondent Concerned Citizens for Chronic Psychiatric Adults.

*Susan R. Oxford* argued the cause for respondents State of New Jersey and the Commissioner of the Department of Human Services (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Susan R. Oxford,* on the brief).

The opinion of the court was delivered by

BILDER, J.A.D.

This appeal involves solely a question of statutory interpretation. It seeks to determine whether *N.J.S.A.* 40:55D–66.2 requires that a community residence for the mentally ill be licensed pursuant to *N.J.S.A.* 30:11B–1 *et seq.,* an act governing community residences for the mentally retarded and developmentally disabled.

On February 16, 1984, the Department of Human Services (Department) approved funding for a proposed group home in Piscataway to be used to house five former psychiatric patients and the staff required for their care. The home is to be run by Concerned Citizens for Chronic Psychiatric Adults (CCCPA), a nonprofit corporation engaged in providing residential care and services to persons just released from mental health facilities. On May 11, 1984, an affiliation agreement was entered into by the Division of Mental Health and Hospitals (Division), CCCPA

and the Community Mental Health Center of Rutgers School of Medicine (technically a part of the University of Medicine and Dentistry of New Jersey) (Health Center) which set forth the responsibilities of each agency with respect to the operation of the home, the services to be furnished to the clients and the provision of funding, training and oversight to the program.

No appeal was taken from the decision to fund the project but in April 1984 Piscataway sought an opinion from the Attorney General as to "whether the Department of Human Services is required by governing law to issue a license prior to the establishment of a community residence for the developmentally disabled." The response from the office of the Attorney General, dated June 11, 1984, advised Piscataway the home would house formerly mentally ill patients rather than developmentally disabled persons and that group homes of this type were not licensed by the Department.

... [N]either the Dept. of Human Services nor the Division of Mental Health and Hospitals licenses group homes of this type. Such homes are licensed, however, by the Dept. of Community Affairs (DCA) under the Rooming and Boarding House Act, *N.J.S.A.* 55:13B–1 *et seq.* This licensure includes such characteristics as the fire safety, sanitation, and other physical attributes. In addition, group homes funded in whole or in part through a service contract with the Division of Mental Health and Hospitals, as this Piscataway home will be, are regulated by the Division of Mental Health and Hospitals under the Community Mental Health Services Act, *N.J.S.A.* 30:9A–1 *et seq.* and accompanying regulations found in *N.J.A.C.* 10:37–1 through 8, as well as through the Division's yearly service contracts, for programmatic characteristics. This includes such aspects as the number and qualifications of staff, the type of supervision to be provided the residents, and the involvement of residents in other types of community support services. Ongoing review of such group homes is provided by the Bureau of Standards and Inspections within the Division of Mental Health and Hospitals.

On June 22, 1984 Piscataway filed a notice of appeal "from a final decision of the Department of Human Services, as reflected in a letter from the Department's legal counsel dated June 11, 1984, to provide funding to [CCCPA] for the establishment of a group residence for mentally ill persons at 139 Metlars Lane, Piscataway, New Jersey." Motions to enjoin further progress with the project pending the determination of

the appeal were denied. Preparations for the use of the house as a group residence have proceeded.

*N.J.S.A.* 40:55D–66.1, a part of the Municipal Land Use Law, provides that "community residences for the developmentally disabled ... shall be a permitted use in all residential districts of a municipality." The term "community residence for the developmentally disabled" is defined in *N.J.S.A.* 40:55D–66.2 which reads in pertinent part as follows:

> As used in this act: *a.* "community residence for the developmentally disabled" means any community residential facility *licensed pursuant to P.L. 1977, c. 448 (C. 30:11B–1 et seq.)* providing food, shelter and personal guidance, under such supervision as required, to not more than 15 *developmentally disabled or mentally ill persons*, who require assistance, temporarily or permanently, in order to live in the community, and shall include, but not be limited to: group homes, half-way houses, intermediate care facilities, supervision apartment living arrangements, and hostels. Such a residence shall not be considered a health care facility within the meaning of the "Health Care Facilities Planning Act" (P.L.1971, c. 136; C. 26:2H–1 et seq.). *In the case of such a community residence housing mentally ill persons, such residence shall have been approved for a purchase of service contract or an affiliation agreement pursuant to such procedures as shall be established by regulation of the Division of Mental Health and Hospitals of the Department of Human Services.* [Emphasis added.]

Piscataway contends that the section requires the CCCPA facility to be licensed pursuant to *N.J.S.A.* 30:11B–1 *et seq.* in order to obtain the special exception of *N.J.S.A.* 40:55D–66.1. Respondents contend the licensure provision applies only to community residences for the developmentally disabled, a group provided for by *N.J.S.A.* 30:11B–1, an act concerning residence for the developmentally disabled, and does not apply to such residences for mentally ill persons, a group provided for by *N.J.S.A.* 30:9A–1 *et seq.*, an act concerning community health services. While both groups fall within the general umbrella of the Department, the former fall within the purview of the Division of Mental Retardation, while the latter are the concern of the Division of Mental Health and Hospitals. Respondents contend that properly read, *N.J.S.A.* 40:55D–66.1 contains alternative requirements for the two types of facilities, licensure for the developmentally disabled—approval for a pur-

chase of service contract or affiliation agreement for the mentally ill.

■ Initially, it should be noted that the appeal is procedurally deficient. If Piscataway is appealing from the funding decision, it has failed to exhaust its administrative remedies, *R.* 2:2–3(a)(2), and may be out of time. *R.* 2:4–1(b). Nonetheless, we believe the matter should be decided on the merits. *See Farmingdale Realty Co. v. Bor. of Farmingdale,* 55 *N.J.* 103, 112 (1969).

> ... this is clearly a case involving only legal questions not calling for the exercise of administrative expertise. The interests of justice and expedition dictate that the exhaustion doctrine be found inapplicable. *[Id.]*

■ The dispute with respect to the proper interpretation of *N.J.S.A.* 40:55D–66.1 arises because the Legislature used the term "developmentally disabled" to broadly encompass two different types of facilities in the Land Use Act although it is normally thought of as a word of art as used in *N.J.S.A.* 30:11B–1 *et seq.* defining a particular specialized group. When read in its broad sense with an understanding that it encompasses both groups, it is clear that the statute provides different preconditions for qualifying as a specially-excepted facility under the Land Use Act. A facility for the developmentally disabled requires licensure. A facility for the mentally ill requires approval for a purchase of service contract or an affiliation agreement. Such a construction accords with the overall statutory and administrative scheme for the provision of aid to the two different groups and is also supported by the legislative history. In the Statement to Senate No. 210 (1978), the Senate County and Municipal Government Committee noted that "[T]he amended bill would provide that community residences for the developmentally disabled and the mentally ill ... which have been licensed *or* approved by the Department of Human Services, shall be a permitted use...." (Emphasis added.)

Affirmed.