IN THE MATTER OF NORMA RANDOLPH.

Argued September 10, 1984—Decided January 7, 1986.

*Robert J. Hrebek* argued the cause for appellant, Monmouth County Sheriff, William M. Lanzaro.

*Frederic S. Kessler* argued the cause for Norma Randolph (*Clapp & Eisenberg,* attorneys).

*Barbara A. Harned,* Deputy Attorney General, argued the cause for the Judiciary (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Arthur Penn* submitted a brief on behalf of *amicus curiae,* the National Association for the Advancement of Colored People, Inc.

PER CURIAM.

This case raises questions concerning the proper balance of a public employee's First Amendment rights of freedom of expression and association with the performance of the public's business. It is necessary to state at the outset what this case is not about, and what it is about. The case is not about a neighborhood housewife serving on a PTA who wishes to work in the court system. The case is primarily about a holder of three appointed political offices who wants to remain active in other branches of government while serving as a courtroom officer. One of the great reforms of the judicial àrticle of the 1947 New Jersey Constitution was the complete separation of politics from the judiciary. We do not believe that constitutional principles of free speech and association require our sanction of a politicized judicial system. We deny the court officer's request to continue to serve in the political offices while employed as a court officer. We also deny the court officer's request to continue to serve in an advocacy role as an officer in two private organizations involved in issues that inevitably spill over into the public arena.

I.

■ This case involves a judicial employee's challenge to court restrictions upon her right to serve on other governmental boards and bodies and as an officer of nonprofit associations that influence governmental policymaking. We hold that when such activities pose a realistic likelihood of (1) involving the judicial employee in important and recurring public issues that

are frequently the subject of political controversy; (2) giving
the impression of judicial involvement in those issues; and (3)
creating the appearance of a judiciary lacking in impartiality
either in general or on such social or political issues, these
activities interfere with the paramount responsibility of the
judiciary to maintain the independence of its members and
employees in both fact and appearance. We find that the
activities considered in this record realistically pose the likeli-
hood of such a disruptive effect upon the work of the judiciary.
Accordingly, we deny the employee's request to continue the
activities while serving as an officer of the court.

The petitioner, Norma Randolph, was hired by the Sheriff of
Monmouth County as a court attendant in January 1983. She is
a uniformed employee who attends the judges of one or more of
the courts located in the Monmouth County Court House in
Freehold, New Jersey. Her duties include supervision of the
activities of parties, jurors, and witnesses in the courtroom; the
work of court crier; swearing in witnesses; sequestering jur-
ors; and in general the performance of nonsecurity tasks
related to the conduct of courtroom business. Shortly after the
commencement of her employment, petitioner submitted a list
of her outside activities to the Monmouth County trial court
administrator. After review, the Administrative Office of the
Courts advised petitioner that she could not continue to serve,
as requested, on the Monmouth County Mental Health Board,
the Freehold Borough Municipal Youth Guidance Council, the
Freehold Borough Citizens Participation Committee for HUD,
or the Freehold Borough Board of Assessment, "primarily
because they are committees of other branches of government,
and also they involve a significant likelihood of involvement in
political activity." The letter further advised Mrs. Randolph
that she could not continue as an officer in the National
Association for the Advancement of Colored People and the
United Progressive Homeowners and Taxpayers Association,
Inc. because these activities also hold a substantial potential for
political activity.

On May 6, 1983, the Assignment Judge of Monmouth County entered an order for compliance with these restrictions, requiring the Sheriff of Monmouth County to reassign Mrs. Randolph should she continue to be engaged in these outside activities. On May 30, 1983, a notice of petition for review on behalf of the Sheriff of Monmouth County was filed with the Supreme Court. The Supreme Court granted the petition and ordered a factual hearing as to the organizational activities of Mrs. Randolph. 94 *N.J.* 549 (1983). A hearing was held on October 21, 1983 before a judge of the Superior Court of Monmouth County. That court submitted recommended findings of fact in accordance with the Supreme Court's order. The petitioner does not take exception to any of those findings, merely adding to them that Mrs. Randolph is the mother of four children and that on the modest salary of a court attendant she supports herself and her youngest son, who is about to enter college; that she has been involved in community activities for over thirty years; that she is an exemplary citizen whose service to the community has gained her many awards, and is deeply committed to the service of her community.

It is no longer appropriate to dispatch such worthy goals and desires with an epigram as Justice Holmes could do when sitting on the Supreme Judicial Court of Massachusetts: "A policeman may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford*, 155 *Mass.* 216, 220, 29 *N.E.* 517, 517–18 (1892). "It is [now] too late in the day to doubt that the liberties of * * * expression may be infringed" indirectly, but just as improperly as directly, by labeling them as conditions upon the privilege of employment. *Sherbert v. Verner*, 374 *U.S.* 398, 404, 83 *S.Ct.* 1790, 1794, 10 *L.Ed.*2d 965, 971 (1963). Public employees do not shed their constitutional rights when they undertake such service. Hence, careful attention must be paid to Norma Randolph's petition to engage in the activities while she serves as a judicial employee. None doubts that she is indeed an exemplary citizen whose desire to continue to serve

her community on its public boards and through community organizations fulfills for her a deep commitment to help others. The question is whether that desire can be reconciled with the public's need for confidence that the judiciary will be unquestionably impartial in resolving the disputes that necessarily arise in community life.

## II.

In *Connick v. Myers*, 461 *U.S.* 138, 103 *S.Ct.* 1684, 75 *L.Ed.* 2d 708 (1983), the Supreme Court reviewed its development of the law relating to the rights of government as employer to regulate the speech of employees. In *Keyishian v. Board of Regents*, 385 *U.S.* 589, 87 *S.Ct.* 675, 17 *L.Ed.*2d 629 (1967), the Supreme Court held that government cannot condition public employment on the surrender of First Amendment rights. Nonetheless, in *Pickering v. Board of Educ.*, 391 *U.S.* 563, 88 *S.Ct.* 1731, 20 *L.Ed.*2d 811 (1968), the Court recognized that government as an employer has interests "in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568, 88 *S.Ct.* at 1734, 20 *L.Ed.*2d at 817.[1] In *Pickering*, the Court invoked a balancing test: the

---

[1] An example is a recognition that provisions that prohibit political activities by federal or state employees are constitutionally permissible. *See Broadrick v. Oklahoma*, 413 *U.S.* 601, 93 *S.Ct.* 2908, 37 *L.Ed.*2d 830 (1973), and *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL–CIO*, 413 *U.S.* 548, 93 *S.Ct.* 2880, 37 *L.Ed.*2d 796 (1973). *Letter Carriers* upheld the authority of the federal government to prohibit its officers and employees from engaging in political activity or making political contributions. *Broadrick* upheld the parallel authority of state governments to prohibit broad categories of employees from taking active roles in organized political activity. Acknowledging that the statute was "directed, by its terms, at political expression which if engaged in by private persons would plainly be protected by the First and Fourteenth Amendments," the Court stated that "there is no question that [it] is valid * * * insofar as it forbids classified employees from * * * becoming members of national, state, or local committees of political parties * * *." 413 *U.S.* at 616, 93 *S.Ct.* at 2918, 37 *L.Ed.*2d at 842–43. "Employees of state and local governments may be subject to a 'little Hatch Act' designed to ensure that government

First Amendment rights asserted by the employee must be weighed against the disruptive effect of the activities on the government's ability to provide services. 391 *U.S.* at 568, 88 *S.Ct.* at 1734, 20 *L.Ed.*2d at 817.

In *Connick v. Myers, supra,* 461 *U.S.* 138, 103 *S.Ct.* 1684, 75 *L.Ed.*2d 708, the Court refined the test by holding that if "employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community," disciplinary measures taken in response to such expression cannot be challenged under the First Amendment absent the most unusual circumstances. *Id.* at 146–47, 103 *S.Ct.* at 1689–1690, 75 *L.Ed.*2d at 719–20. In that case an assistant district attorney about to be transferred from one section of the criminal court to another circulated a questionnaire among her colleagues soliciting their views about office conditions. The prosecutor, viewing this as a "mini insurrection," fired the assistant prosecutor. The Supreme Court held that the protection afforded under *Pickering* extends only to "matters of legitimate public concern" and regarded this incident as only an individual grievance. It therefore was not a matter of public concern (with the exception of one issue concerning pressure to work in electoral campaigns).

We need not engage in the sharp debate that divides the Supreme Court over *Connick*'s threshold requirement of a "public concern" test for protected employee speech and expression. Here, there is no question that Norma Randolph's concerns are deeply public and invoke none of the strictly internal employee grievances that *Connick* speaks of.

Both the majority and the dissent on the Supreme Court would appear to agree that the *Pickering-Connick* rationale is

operates effectively and fairly, that public confidence in government is not undermined, and that government employees do not become a powerful political machine controlled by incumbent officials." *Abood v. Detroit Bd. of Educ.,* 431 *U.S.* 209, 230 n. 27, 97 *S.Ct.* 1782, 1797 n. 27, 52 *L.Ed.*2d 261, 281 n. 27 (1977).

to seek a balance "between the interest of public employees in speaking freely and that of public employers in operating their workplaces without disruption." *Rowland v. Mad River Local School Dist.*, —— *U.S.* ——, ——, 105 *S.Ct.* 1373, 1376, 84 *L.Ed.* 2d 392, 395 (1985) (Brennan, J., dissenting from denial of *certiorari* in Mem. No. 84–532).

Petitioner contends that *In re Hinds*, 90 *N.J.* 604, 614 (1982), mandates a stricter standard under the New Jersey Constitution, requiring a court to consider that:

First, the limitation must "further an important or substantial governmental interest unrelated to the suppression of expression." *Procunier v. Martinez*, 416 *U.S.* 396, 413, 94 *S.Ct.* 1800, 1811, 40 *L.Ed.*2d 224, 240 (1974). Second, the restriction must be "no greater than is necessary or essential to the protection of the particular governmental interest involved." [*Id.*]

We must observe, however, that *Hinds* did not arise in the context of employee speech. Hinds was an attorney speaking on the quality of justice in a pending trial. Had a court employee undertaken to offer a rebuttal expressing an opinion on the defendant's guilt, there can be no doubt that the judiciary as employer would have been able to prohibit such interference with the defendant's right to a fair trial. The *Pickering* Court specifically declined to state a "general standard" by which all conflicts could be judged. Note, "Politics and the Non-civil Service Public Employee: A Categorical Approach to First Amendment Protection," 85 *Colum.L.Rev.* 558, 560 (1985).

We are satisfied that the balancing process to be employed will take into account the two factors of *Hinds* as we weigh in the balance the substantial interest of the judiciary, the forms of expression involved, and the availability of other means to achieve the goals of the judiciary. We believe that the same considerations are implicit, if not explicit, in the analysis under both constitutions and point toward the same result. *See Greenberg v. Kimmelman*, 99 *N.J.* 552, 567 (1985). We do not perceive, then, the protections afforded by the New Jersey Constitution as distinctly different in this context. Hence, we must focus carefully on the specific activities and expression

that the employee wishes to continue in order to determine whether these activities will have a disruptive effect upon the work of the judiciary.

## III.

We begin by emphasizing New Jersey's unique commitment to an independent judiciary. This concern for an independent judiciary is at the heart of the American legal system. One of the great advances made in the structure of government by our Federal Constitution was its provision for an independent judiciary whose judges could perform their duties as they saw fit without fear or favor. The plan of our Federal Constitution was to preserve as far as possible the liberty of our people by guaranteeing that they have judges wholly independent of the government or any of its agencies. A judiciary is not independent unless courts of justice are enabled to administer justice, absent pressure from without.

> Especially in the administration of the criminal law—that most awesome aspect of government—society needs independent courts of justice. This means judges free from control by the executive, free from all ties with political interests, free from all fears of reprisal or hopes of reward. The safety of society and the security of the innocent alike depend upon wise and impartial criminal justice. [*Pennekamp v. Florida*, 328 *U.S.* 331, 356–57, 66 *S.Ct.* 1029, 90 *L.Ed.* 1295, 1309 (1946) (Frankfurter, J., concurring).] [2]

The founders of our institutions, deeply distrustful of judges beholden to the Crown, sought to guarantee forever liberty under law. To preserve their freedoms, they created three branches of government, and vested executive, legislative, and judicial powers in these separate agencies to guarantee the

----

[2] Justice Frankfurter recalled the words of John Adams on the First Constitution of Massachusetts:

> It is essential to the preservation of the rights of every individual, his life, liberty, property and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit. [Article XXIX of the Declaration of Rights of the Constitution of Massachusetts (1780).]

independence of each. *Immigration and Naturalization Serv. v. Chadha,* 462 *U.S.* 919, 962, 103 *S.Ct.* 2764, 77 *L.Ed.*2d 317, 351 (1983) (Powell, J., concurring). The judicial article of our 1947 Constitution largely mirrors Article III of the United States Constitution. Our judges shall be appointed by the Executive with the advice and consent of the Senate; they "shall hold their offices for initial terms of seven years and upon reappointment shall hold their offices during good behavior." *N.J. Const.* of 1947 art. VI, sec. 6, paras. 1 and 3. They are and must be divorced from all aspects of public life. "They shall not, while in office, engage in the practice of law or other gainful pursuit." *N.J. Const.* of 1947 art. VI, sec. 6, para. 6. Like judges in the federal system, they are to hold their office during good behavior, their compensation is not to be diminished during their continuation in office, and they may be removed only by impeachment or statutory removal proceedings. *N.J. Const.* of 1947 art. VI, sec. 6, paras. 3, 4 and 6. In addition, they shall hold no other office and "[a]ny such Justice or Judge who shall become a candidate for an elective public office shall thereby forfeit his judicial office." *N.J. Const.* of 1947 art. VI, sec. 6, para. 7. The Code of Judicial Conduct recommended by the American Bar Association and adopted by this Court reinforces the strict impartiality of the judiciary. In particular, Canon 7 of the Code of Judicial Conduct admonishes a judge to refrain from political activity. Our Court's concern for restriction of activities has been evidenced by restrictions upon judges that exceed the minimum restrictions imposed by the Code of Judicial Conduct. For example, we believe that we are alone in expecting that judges will not teach or lecture for compensation. In short, we have imposed restrictions in the public interest and in the interest of an independent judiciary that far exceed the minimal restrictions suggested by the American Bar Association Canons.

This policy has been implemented by Rule 1:17–1, which applies the ban on political activity and candidacy for an

elective public office not only to judges but to all court personnel. The rule provides:

> The following persons in or serving the judicial branch of government shall not hold any elective public office nor be a candidate therefor, nor engage in political activity * * *:
>
> (a) Judges;
>
> (b) The Administrative Director of the Courts, the Clerk of the Supreme Court, the Clerk of the Superior Court, the Clerk of the Tax Court, and all employees of their respective offices, and official court reporters;
>
> (c) Probation officers and all employees of county probation departments;
>
>    *     *     *     *     *     *     *     *
>
> (f) Law secretaries, stenographers, sergeants-at-arms, court criers, assignment clerks, courtroom clerks, court attendants and all public employees regularly assigned to a judge or court; 3
>
>    *     *     *     *     *     *     *     *
>
> (i) Clerks, deputy clerks, violations clerks and all persons employed by or regularly assigned to a municipal court.

At stake here is the fulfillment of the constitutional ideal:

> It was almost fortuitous that the pre-1948 system produced so many fine judges and was in fact so seldom touched by the pressure of outside politics. In any event, the turnabout in 1948 was complete, such that there exists today a court system independent of partisan political or other outside pressures of any kind. So was and is being served the interest of the people of New Jersey in an independent judiciary. [*In re Gaulkin*, 69 *N.J.* 185, 192 (1976).]

What can we say of this ideal of judicial independence that has not been said? That "[t]he complete independence of the courts of justice is peculiarly essential in a limited Constitution," *The Federalist No. 78*, at 484 (A. Hamilton) (H. Lodge ed. 1888); that any "lessening [of] the independence of the judiciary [attacks] not only the judicial power, but the democratic republic itself," A. de Tocqueville, *Democracy in America* 289 (Vintage Books 1945); that "we would rather have an independent Court, a fearless Court, a Court that will dare to announce its honest opinions in what it believes to be the defense of

---

3Rule 1:17–2 provides that the ban on political activity does not apply to all employees of sheriffs but only to sheriffs' employees who are specifically referred to in Rule 1:17–1. As noted, Norma Randolph is a court attendant who serves as a court crier and is regularly assigned to a judge or court.

liberties of the people, than a Court that, out of fear or sense of obligation to the appointing power, or factional passion, approves any measure we may enact," S.Rep. No. 711, 75th Cong., 1st Sess. 14 (1937) (rejecting the 1937 court-packing plan). These are not the words of dreamers, these are the words of realists reminding us to remain true to the ideal. The judiciary seeks to advance these governmental interests by its rule proscribing political activities by judicial employees. That ideal requires "judges beholden to no man, independent and honest and—*equally important—believed by all men to be independent and honest * * *."* Chief Justice A.T. Vanderbilt, *The Challenge of Law Reform* (Princeton Univ. Press 1955) at 11 (emphasis added).

## IV.

In application of the rule to petitioner, several threshold questions have been raised. The first is whether we should limit our rule to partisan political activity. Petitioner points out that the prior rule referred to *"partisan* political activity," rather than simply "political activity," suggesting that such interpretation would fully effectuate the purposes set forth in Canon 7 of the Code of Judicial Conduct. We disagree. There is more to political activity than party politics. Those who "attempt to influence governmental policymaking, their activities—and the views of members who disagree with them—may be properly termed political." *Abood v. Detroit Bd. of Educ.,* 431 *U.S.* 209, 231, 97 *S.Ct.* 1782, 1797, 52 *L.Ed.*2d 261, 281 (1977). In our pluralistic society advocacy organizations play a vital role in the exercise of political power. *Federal Election Comm'n v. National Conservative Political Action Comm.,* 470 *U.S.* ——, 105 *S.Ct.* 1459, 84 *L.Ed.*2d 455 (1985). It is naive to think of even advisory boards or bodies as not influencing the body politic. It has been traditional in New Jersey's judiciary to construe "political activity" to include activity supporting or opposing different sides of social, political, and legislative issues. Not only is a judge prohibited from engag-

ing in political activities, Canon 7, but the permission of Canon 5(B) to engage in "civic and charitable activities" is qualified by the language that they "not reflect adversely upon his impartiality or interfere with the performance of his judicial duties" and further that the organization is "not conducted for the economic or political advantage of its members." Our construction of the restriction on political activity to cover issue activity is based on the inevitable identification of the judge with the particular parties, organizations, or candidates advocating positions on the issues that may come before the court. Simply put, issue activity is political activity. *Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*, 454 *U.S.* 290, 102 *S.Ct.* 434, 70 *L.Ed.*2d 492 (1981). Moreover, the consistent administrative interpretation of our Rule, even in its prior form, has been to limit outside political activities, even those that were not partisan in nature. As we shall see in the substantive discussion of the petitioner's activities, we are convinced that there is a clear danger to the appearance of neutrality that must be maintained by all connected with the judiciary, including judges and employees.

Second, petitioner contends that although these restrictions are appropriate for judges, they are unnecessary for nonjudicial employees whose role in the system is not perceived as being as direct as that of the judge. The Pennsylvania Supreme Court in *In re Prohibition of Political Activities by Court-Appointed Employees*, 473 *Pa.* 554, 375 *A.*2d 1257 (1977), articulated the reasonableness of such political activity bans on persons such as assistant probation officers by stating: "The purpose of [the ban], of course, was to maintain not only the independence, integrity and impartiality of the judicial system but also *the appearance* of these qualities." *Id.* at 560, 375 *A.*2d at 1259 (emphasis added); *see also Opinion of the Justices to the Senate*, 375 *Mass.* 795, 376 *N.E.*2d 810 (1978) (judicial employees may be required to file financial disclosure statements to sustain confidence in impartiality of justice system).

Thus, in *Connealy v. Walsh,* 412 *F.Supp.* 146 (W.D.Mo.1976), an officer of the juvenile court was terminated from her job because she refused to remove a "McGovern" bumper sticker from her car. The court upheld the dismissal largely because of the possible appearance of bias and the potential effect of a display of political affiliation on her relationship with those individuals she was to help.

The court in *Connealy* emphasized that where the employee's duties "require establishment and maintenance of a relationship of trust and confidence ... the state has a valid interest in prohibiting activities which would adversely affect that relationship." *Id.* at 155. Although the bumper sticker represented traditional party affiliation, that court noted that a sticker supporting candidates of the Nazi party or the Ku Klux Klan, for example, could destroy the relationship of confidence between court officers and the juveniles who appear in the court system. *Id.* at 156. Regardless of the affiliation, there are members of society who see such symbols as signs of oppression or enmity, which when identified with the judiciary or its employees are equally dangerous to the independent stance of the judiciary.

> [I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent. [*Id.* at 158 (quoting *Civil Service Comm'n v. Letter Carriers, supra,* 413 *U.S.* at 565, 93 *S.Ct.* at 2890, 37 *L.Ed.2d* at 809).]

Missouri's interest in preserving public confidence in the fact and appearance of the integrity and impartiality of the judiciary was compelling and outweighed the employee's interest in publicly expressing her political preference. *Connealy v. Walsh, supra,* 412 *F.Supp.* at 158; *see also Phillips v. Adult Probation Dep't of San Francisco,* 491 *F.*2d 951 (9th Cir.1974) (deputy probation officer may be prohibited from displaying signs expressing opinion in favor of fugitive radicals). *But see Abbott v. Thetford,* 529 *F.*2d 695 (5th Cir.1976) (judicial prohibition against institution of litigation by probation officer invalid

because motivated by judge's disapproval of the litigation, not disruption of court practices).

In each of these instances it is recognized that speech, association, and expression of judicial employees may be restricted if there is a substantial likelihood of interference with or disruption of the administration of the court's services. It is the practice that we have long followed.

> Since 1948, when the judicial system created by Article VI of the 1947 Constitution came into existence, judges and *others officially associated with that court system have been wholly* divorced from involvement in partisan or other political activity, as a necessary sacrifice for the sake of judicial integrity and public appearance thereof. [*In re Gaulkin, supra,* 69 *N.J.* at 189 (emphasis added).] [4]

That continuous tradition was molded in a series of decisions, the most prominent of which followed closely upon the adoption of a 1961 Court Rule specifically banning partisan political activity by court employees and requiring the covered employees to request prior approval to hold any other public office.[5] In the early years following the adoption of the Rule, the Court quickly determined that the prohibition of "partisan political

---

[4]Petitioner also contends that the language of the rule is vague and ambiguous, resulting in an unconstitutionally-overbroad restriction on public activities. We are satisfied that the proscribed activities are capable of being understood by the persons who must guide their conduct thereby; and, in any event, we are satisfied that the due process afforded to the employee by the proceedings held at the trial level and by our substantive review prior to the imposition of any remedy fully vindicates the employee's interest in procedural fairness. Each member of the judiciary or court support personnel who applies to the court for permission to serve with an organization receives the same consideration with respect to the decisional process and factual hearings can be entertained in any proceeding appropriate to decision.

[5]The 1961 rule (*R.R.* 1:25C(a)) was amended in 1969 to conform substantially to its present form as it appears in Rule 1:17-1. The comment published in 1967 in connection with this rule change recited:

> 1. The introductory sentence of this rule substitutes the phrase "political activity" for "partisan political activity" in the source rule. The word "partisan" has been dropped since the Supreme Court has interpreted the present rule as barring those persons covered thereby from being active in non-partisan political elections.

activity" was broader than the concept of traditional party politics. Thus it ruled that judicial employees should not be active in non-partisan movements to change the forms of city government or in voter registration drives because such activity was, although non-partisan in the party sense, clearly political in the sense of involving the judiciary in political activity. In a series of decisions interpreting the Rule, the Court would not permit court attendants or court aides or court clerks or probation officers to serve, among other things, as members of a local board of education, on a board of adjustment, as a tax assessor, on a commission for youth and economic rehabilitation, on the municipal utilities authority, in an anti-poverty program, on a county community action planning committee. These restraints, as noted, became express following the 1969 amendment to the Rules that specifically prohibited any form of political activity by court officials; and, generally speaking, since then our decisions have precluded service by such persons as probation officers and court clerks on parking authorities, boards of adjustment, planning boards, library boards, boards of health, drug abuse commissions, local property owners' associations, youth guidance councils, and a national political organization of women. At the same time, the Court was not intractable in adopting a rule that would ban all outside activity by court employees. Its decisions reflect a focus on two guiding factors: (1) the closeness of the employee to the judge; and (2) the probability that the political issues, whether partisan or not, are those around which political campaigns might be shaped.[6] From these decisions and principles, then, we have

---

[6]Chief Justice Weintraub articulated the first factor most clearly in remarks to new judges in 1968 when he explained the Court's policy on supporting personnel and related it to the public perception of justice:

Generally the idea is whatever restrictions apply to the judge apply to the supporting personnel in the courtroom. That will mean that your court clerk, the court attendant, who actually in some counties, perhaps most, is an employee of a sheriff's office and is assigned over to the judicial

distilled a flexible rule that is tailored to the relationship or proximity of the employee to the decision-maker and to the nature and extent of the political activities sought to be engaged in by the employee. Each case requires a careful balancing of the interests involved. Thus the Court has determined that service by a probation officer on a municipal shade tree commission be approved because the appointment was not likely to involve the officer in controversy; that a probation officer be allowed to serve on a county advisory committee on alcoholism because of the special role of the probation services in understanding such concerns and because of the assistance it could render in the program and the limited role of the agency itself. These decisions reflect a balance that is related to the closeness of the employee to the judicial decision-maker and the realistic likelihood that the activities will become the focus of public controversy.

Our dissenting members chide us on two scores: they claim that we have adopted a "blanket ban" on all community and civic involvement, *post* at 474, but at the same time accuse us of inconsistency through "uneven application," *post* at 464. What they see is a process at work. In almost every judicial decision, sound arguments can be made for the opposite result. Only the actual exercise of that balancing process will determine whether the activities pose a realistic likelihood of involving the employee in important and recurring public issues that are a frequent subject of political controversy, that create the appearance of judicial involvement in those issues, and that

---

branch, he is subject to all the limitations with respect to political activity, and so on, that apply to the judge. That can become a little bit sticky.

I had a call recently from a gentleman who couldn't understand it. * * * I suggested to him that it would be very easy if he simply had the sheriff assign him to duties outside of the courthouse. By courthouse I mean courtroom. If they are assigned out we have no interest in them. We are concerned with those that are assigned to the courtroom. * * * If he wants to be on our end, on our side of the fence, he has to abide by the same restrictions that apply to us. The prohibition on political activity is absolute.

generally give the appearance of a judiciary lacking in impartiality on the issues involved.

## V.

With these specific principles for guidance, we turn to the particular activities to determine whether they can be continued without offending the outlined principles and without disruption of the governmental activity of the judiciary.

### A. *Public Organizations*

The Monmouth County Mental Health Board, the Freehold Borough Board of Assessment, the Freehold Borough Youth Guidance Council, and the Freehold Borough Citizens Participation Group HUD, are public organizations established according to statutory authority. Each plays a role designated by statute, regulation, or ordinance in government and public affairs.

The Monmouth County Mental Health Board is a public body established by *N.J.S.A.* 30:9A–3. It is an agency of county government. Among its duties established by *N.J.S.A.* 30:9A–5 are involvement in the selection of community mental health service projects to be funded by the State; the development of a comprehensive plan of community mental health services; and the recommendation of the amount of state financial aid to be allocated to each such project in the county. The Board must necessarily involve itself in legislation that involves the funding for mental health projects. (Pending resolution of this matter, Mrs. Randolph was not reappointed to this board.)

The Freehold Borough Board of Assessment is established pursuant to *N.J.S.A.* 40:56–1, in particular, *N.J.S.A.* 40:56–21. Its function is to make assessments of benefits accruing from local improvements in the Borough. The Board is to examine real estate in the vicinity of a local improvement to determine what lands have been benefited and also to fix and determine

the amount of damages accruing to any property by reason of construction of municipal facilities.

The Citizens Participation Group of the Freehold Borough HUD is an organization constituted under federal regulations of the Department of Housing and Urban Development (HUD) that required citizens' participation for Community Development Block Grants funded through the Housing and Community Development Act of 1974, 88 Stat. 633, as amended, 42 *U.S.C.* §§ 5301–5320 (1976 ed. and Supp. V). Under that act, the Secretary of HUD was authorized to dispense federal block grants to state and local governments and nonprofit community organizations for urban renewal programs such as the rehabilitation of residential structures, code enforcement in deteriorating areas, and the construction of public works projects. The function of such a group is to hold public hearings and determine the establishment of priorities for the expenditure of funds allocated to the communities in connection with the community block grant program.

The Borough of Freehold Youth Guidance Council is a public body established pursuant to *N.J.S.A.* 9:22–1. Its purpose is in part to serve as a "pre-complaint diversionary program." Instead of signing juvenile complaints, police officials may refer them to the Youth Guidance Council, which makes a recommendation for corrective action. The Council has no powers of enforcement or direct connection with the court system.

None of these organizations endorses political candidates or is involved in partisan politics, but the first three of them are deeply involved in the political activity of the community. The determination of which section of the community shall receive community development block grant programs can be a highly-charged political decision. Such a decision has a realistic likelihood of involvement in litigation if dissatisfied citizens protest the action of the governing body in adopting its plan for participation in the community-development block-grant program. Few subjects are more controversial than a public

improvement. The citizen whose lands have been the subject of a road improvement or a sewer assessment finds himself or herself deeply embroiled in a community dispute about the wisdom or necessity of the improvement. An equally realistic likelihood for public controversy arises with respect to the determination of funds and sites for community mental health programs. Although the number of citizens involved in such work is not large, their concern is deep.

The Freehold Borough Youth Guidance Council serves as an alternative to judicial enforcement. Individuals and families who have been subjected to its process and who later appear in court might understandably feel that their position was somewhat compromised by their prior involvement with the court employee in the employee's municipal capacity. In addition, citizen complainants affected by the disposition of a juvenile matter may be aggrieved if the community representative is at the same time a court employee. Finally, one of the agency's missions is to respond to a court's finding that the child's delinquency is "attributable in whole or in part to the existence of deleterious, degrading or deteriorating conditions, practices or influences within the municipality." *N.J.S.A.* 9:21–1.

Hence, we perceive in each of these governmental agencies a realistic likelihood of involvement in community disputes. These disputes are intensely political in the sense that they are directly aimed at government action or inaction, and often reflect the viewpoint of larger political movements. Such movements may transcend partisan party activities. Such disputes divide the members of a community in its most political activity, that of self-government. More often than not such issues will correspond directly with partisan political activities. Indeed, they may include both major parties on one side or the other, but they are always bitterly partisan in a factional sense. These issues very often wind up determining positions of the parties and the voting of citizens in a local election.

Moreover, the very appointment of the judicial employee to the position is an involvement in politics. Members of government boards are not drawn from a computer list of available citizens as, for example, jurors are. They are chosen by elected political figures who cannot be faulted if they yield to political wisdom in their selections for governmental boards. Realistically, such appointments come about through politics in the broader sense. The dissent would have us trace the origins of such appointments to assure ourselves of their pristine nature. *Post* at 466. That is simply unfeasible if not impossible.

Finally, it is another reality that courts are frequently called upon to resolve the disputes that arise from the exercise of political choice by these boards. (If there is any doubt that such activities cast participants in such public affairs into the center of judicial controversy, a random survey of recent decisions will disclose the extent of judicial involvement. *See* Appendix, *post* at 455–457. And whether litigation ensues or not, each of the parties involved in such local controversy should enjoy the fullest confidence that the court system has no stake in the controversy. We simply do not want anyone walking into a judge's courtroom on any matter thinking that the judge is somehow connected with the person who made the assessment, or who participated in it, or the person who tried to have all the money allocated to the development project that the litigant bitterly opposes. More importantly, we do not want the public wondering whether the judge may share the views of that judicial employee; we want every person walking into that court to understand that the judge and the entire court are dispassionate and impartial.

## B. *Private Organizations*

Norma Randolph is involved in two private organizations: the United Progressive Homeowners and Taxpayers Association, and the National Association for the Advancement of Colored People.

When we view these activities, we must keep in mind the contrasts between membership in committees of other branches of government and private associational activity. In the former context, in striking the appropriate constitutional balance we place on one side of the scales of justice this Court's right and duty to preserve the independence of the judiciary, and on the other side the employee's fundamental right to free speech and association. We recognize the difference between someone who is close to the decision-making process, such as a judge or a law clerk, and someone who may perform similarly important functions but is not close to that process, such as a court aide. The fact that a court aide is employed by the county sheriff rather than the judiciary should be weighed with the fact that the aide works in and around the courtroom. The difference between partisan and non-partisan political office and the further distinction between appointed positions that are close to the heart of government and those that are more remote should also be considered. Appointment to any public office poses a greater likelihood of impermissible judicial involvement in other levels of government and the political process. For this reason we agree with the conclusion below that Mrs. Randolph may not continue in her public positions.

She argues that her service as an officer of a local chapter of the NAACP and of a homeowners' association does not pose an equal threat to the independence of the judiciary. While such organizations may, in some sense, be educational and civic in nature, they have also become organizations with political goals, in the broader sense mentioned above. There are very few issues today with a more significant legislative and political content than civil rights. It is, as a practical matter, almost impossible to deliver the most dispassionate lecture on the subject without the highest risk of being perceived as a partisan for or against legislation and, sometimes, for or against particular candidates or office holders. Hence, we must carefully examine the organizations and petitioner's role in them.

■ The United Progressive Homeowners and Taxpayers Association is an organization that was formed as a direct outgrowth of the Citizens Participation Group of the Freehold Borough for HUD. The organization has no affiliation with any political party, does not endorse political candidates or seek to influence legislation. It was involved directly in soliciting funds from the community to develop a county-owned building known as the "Court Street School" as a community resource facility. Norma Randolph is second vice-president of the organization; her name is on the letterhead. She describes her duties as being to fill in for the president and first vice-president if necessary. Petitioner negotiated directly with county officials for the allocation of funds; she has been described as the spokesperson for the organization; and serves as the liaison representative of the Greater Red Bank NAACP to this organization.

We are satisfied that on this record petitioner's advocacy role on behalf of this organization in the solicitation of funds from public agencies and in its efforts to influence the appropriation or allocation of public funds to the development of the community center possesses the realistic likelihood for political conflict between competing community groups over the allocation of these diminishing resources. Consequently, we cannot sanction continued public involvement in issues that pose a realistic likelihood of compromising the independence of the judiciary.

■ Our final and most sympathetic concern is with Mrs. Randolph's desire to continue to serve as an officer of the Greater Red Bank Branch of the National Association for the Advancement of Colored People. Knowledge of its purposes and goals is part of our national culture. *See NAACP v. Button,* 371 *U.S.* 415, 83 *S.Ct.* 328, 9 *L.Ed.*2d 405 (1963). Its members seek, through cooperative organizational activity, to achieve the legitimate political goal of eliminating all racial barriers that deprive black citizens of the privileges and burdens of equal citizenship rights in the United States. *Id.* at 430,

83 *S.Ct.* at 336, 9 *L.Ed.*2d at 416. To be thus involved is a deeply felt goal of its members for "[o]ur form of government is built on the premise that every citizen shall have the right to engage in political expression and association." *Id.* at 431, 83 *S.Ct.* at 337, 9 *L.Ed.*2d at 417 (quoting *Sweezy v. New Hampshire,* 354 *U.S.* 234, 250–51, 77 *S.Ct.* 1203, 1211–1212, 1 *L.Ed.*2d 1311, 1325 (1957)).

Yet we cannot deny that in conducting its activities the organization would be unfaithful to its purposes if it did not seek to hurl itself into the center of the deeply divisive political controversies that surround the elimination of every trace of prejudice and bias in our society. The charter of the Greater Red Bank Branch of the NAACP evidences commitment to the same goals. In achieving these goals, although non-partisan, the organization cannot and should not refrain from political activity in the broader sense of influencing governmental policy. Among its committees is a political action committee whose duties, according to the constitution and by-laws, include to:

1. Seek to increase registration and voting.

2. Work for the enactment of municipal, state and federal legislation designed to improve the educational, political, and economic status of minority groups.

3. Seek the repeal of racially discriminatory legislation.

4. Work to improve the administration of justice.

5. Work to secure equal enforcement of the law.

6. Keep the National Office and the Branch informed of all proposed legislation which affects minority groups. The Committee shall be non-partisan and shall not endorse candidates for public office.

The Red Bank chapter does not support or oppose specific political candidates. Once a year, however, the branch does host a "Candidate Night" on which all candidates are invited to present their views; local press coverage of the event in 1983 is part of the record below. The organization's primary work consists of efforts to register voters. All of its members participate in house-by-house canvassing for registration, and on election days, including the day of a school board election, members record non-voters and offer transportation to polling

places. No record or apparent effort is made to ascertain or advocate a particular party affiliation of any voter.

In this case the record discloses as well that in the period of inquiry the Greater Red Bank Branch had been actively involved in public positions with respect to the discriminatory effect of various public issues. These and other community issues are deeply political, involving the most fundamental of governmental choices. In our state not all would agree that the premises of *Mount Laurel II* reflect the harmonious accommodation of mutual interests of the various members of society. It was the Southern Burlington County NAACP that was the party-plaintiff in the original litigation that brought the issue to court. *See Southern Burlington County N.A.A.C.P. v. Mount Laurel Township,* 92 *N.J.* 158 (1983). Concededly, Norma Randolph's branch is not now involved in such pending or current litigation. Yet when the parties to such litigation are ushered into the courtroom, are administered the oath, and the case proceeds, we must ask whether they would have the fullest confidence knowing that an officer of the court was at one and the same time an officer of an organization actively pursuing the litigation. And even if the organization were not itself an active party litigant, every citizen involved in these deeply controversial public issues should share the unshakeable confidence that the judiciary has removed itself from such controversy and stands ready, if called upon, to decide dispassionately and impartially appropriate issues that may be presented to it for adjudication.

On this record, we are left with a certainty that an advocacy or leadership role by Norma Randolph in voter registration activities, candidates' nights, reallocation of surplus foods, or private-sector employment poses a realistic threat of compromising the independence of the judiciary. These activities—especially voter-registration drives and candidate nights—inevitably spill over into the political arena. Since her duties as trustee or executive board member bring her into these public issues or controversies, holding such office while serving as a

courtroom officer is inconsistent with the assurance that ours is an independent judiciary in fact and appearance. It cannot be permitted.

## VI.

Our dissenting members recognize the same general principles that we do but they differ in their application of the *Pickering* balancing test. They differ from us in outcome because they see the court attendant's role as not sufficiently "sensitive to the decision-making process" of the judiciary, *post* at 470, to warrant the restrictions that we would require of courtroom officers.

They see a gulf between the judge and the court officer and they assume that litigants and the public will see the same gulf and disassociate the two. Hence they claim to see no danger to the independent stance of the judiciary. Their logic would lead to a courtroom with a judge presiding over trials with the aid of the head of the local political party or possibly a highly-detested political activist organization. This case cannot be decided as if petitioner were the only court aide in the system. We must ask ourselves how independent the stance of the judiciary remains when not one but many, or indeed all, of the aides in a courthouse participate in political affairs or other activities that spill over into the political arena. If the dissenters shrink from such a vision, it is not because of principle but because of the way they view the brand of politics that is being practiced. Of course, we agree that the purposes of the NAACP are consistent with American ideals, but we would not establish a principle upon the basis of whether or not we like the politics or political activity of the court officer.

Nor would we yield to federal practice that limits court clerks' activities only in the area of partisan politics. So deep and so strong is the tradition of an independent federal judiciary that its history may never have reflected the concerns that we experienced in the transition from a prior system.

Moreover, federal district courts and officers are often distant from the arena of controversy. The rules that we fashion must be relevant to a system formed upon the county court house and municipal court. In such a system, court personnel are the community members.

The dissent suggests further that we should better leave the matter to the presiding judge to resolve the courtroom conflicts "as they arise." *Post* at 474. This suggestion is impractical. It presupposes a court system Olympian in calendar-control practices. Our system is somewhat different. A trial judge is handed a matter often on short notice. We would rather have the judge focus on the substantive legal issues found in the jacket rather than canvass memory to determine whether one of the courtroom officers should be asked to step aside. For the most part, to apply such a rule would be impossible in the smaller courts such as our municipal courts where there is no one to step aside for. It is a path that has been suggested in other areas of disqualification and one that we have rejected. *See Greenberg v. Kimmelman, supra,* 99 *N.J.* at 574–75. It is not simply the administrative difficulty of having the clerk step out of the courtroom. The fact is that the damage is already done. As long as the public remembers the judicial employee's activity in a controversial political issue, that person and the court are stamped with that memory. It is that stamp of partisanship that cannot be eradicated.

Finally, we are encouraged to disregard the authorized work of the petitioner and conclude that her activities are limited to those of filling water glasses and other menial tasks, as the dissent would suggest, *post* at 469. In addition to degrading the status of Norma Randolph, such a conclusion would require the Court to engage in highly individualistic determinations with respect to each court attendant as to the functions and duties assigned by his or her particular judge. We cannot fashion principles of law on the basis that an individual courtroom attendant had not yet "received a direct order from a judge." *Post* at 469. It would bewilder our trial judges to

suggest that they should be careful about directly addressing courtroom attendants lest they become too closely identified. The reality of our system is otherwise. Court attendants are usually assigned to an individual judge. They become a closely-knit team. We cannot evaluate the relationship between each judge and each court officer. The relevant factor is, as Chief Justice Weintraub pointed out, that she has been assigned by the Sheriff to the courtroom. She is authorized to perform important public duties in connection with the administration of justice. We demean her and her office by suggesting that the duties are not closely related to the business of the judiciary. Whether we intend the effect or not, for many witnesses and litigants the court attendant presents a close association with the judicial process. She is indeed far more visible than the court clerk, law clerk, or secretary of the judge. We conclude that her identification with the judge is sufficient to meet the criteria outlined for creating the appearance of judicial involvement in controversial political issues.

## VII.

We deeply respect the desire of Norma Randolph to continue to participate in these organizations, public and private. It is a commendable desire. But so long as she serves on the side of the judiciary, we must come down on the side of preserving the independent role of that judiciary.

> In all cases great or small this must be to render judgment evenly and dispassionately according to law, as each is given understanding to ascertain and apply it. No man or group is above the law. Nor is any beyond its protection. * * * These truths apply equally to the Government. When its power is exerted against the citizen or another in the nation's courts, those tribunals stand not as partisans, but as independent and impartial arbiters to see that the balance between power and right is held even. [*U.S. v. United Mine Workers of America*, 330 *U.S.* 258, 342–43, 67 *S.Ct.* 677, 719–720, 91 *L.Ed.* 884, 938 (1947) (Rutledge, J., dissenting) (citation omitted).]

It is not without significance that the symbol of justice shields her eyes from the contestants. The face of justice must be disinterestedly detached. We do not believe that we must prove beyond debate that this detachment is necessarily lost, or

that litigants will start to think that a judge will be partial to a particular group or philosophy, because of association with politically-active court personnel. More is at stake here than proof of prejudice. We think that there is a much more subtle value involved, and do not think the Constitution prevents us from promoting such values, even if they are difficult to describe or prove, so long as they represent something very important. There is a tone, a feeling, an atmosphere, of impartiality that should surround everything that has to do with the judiciary. That subtle value is destroyed or damaged each time that someone closely connected with the courts does something that judges should not do even though they are not judges. The value involved is enormous. It is not just "trusting the court." It is a feeling of total confidence that when you step into a courtroom, you are inside an institution that has taken every care not only to judge your case fairly but to give you confidence that it will be judged fairly. That feeling will be lost if you must take the oath from one who has campaigned vigorously against your cause, if you must have jurors placed under the watch of a bitter foe, if you must see a judge's clerk who is a leader of the movement that abhors the goals of your lawsuit. And that lost feeling will go well beyond the question of whether the judge is deciding a particular matter dispassionately, without fear or favor. It will go to the general impression the public has of the judge—its impression of whether the judge is balanced, non-partisan, separated from all factions, someone who can handle the matter with a totally open mind— the kind of an impression and appearance that we are determined to maintain. That is the most fundamental reason why judges and their employees cannot be involved in the political activities that divide our communities. When a judge confers closely with a court aide, is seen with that court aide regularly, has that court aide at the right hand to help in the many things that have to do with the court itself, even if not with its decisions, people simply have the right to wonder just how non-partisan the court really is.

These are not abstract concerns. These are the realities of human experience. What litigants experience is the public face of justice. It is a face that includes much more than the judges; it includes everyone who works in that courtroom and everything that worker portrays to the public. The face that the public sees should have the appearance of total honesty and total impartiality. That impartiality will be lost when the visible face of the judicial system, presented through its employees in a courtroom, portrays a commitment not only to one of the parties or issues involved in litigation before the court but to any partisan cause. To preserve that independence and impartiality for all, our employees must forego roles in the public political arena.

Despite the suggestions of the dissent, we impose no restrictions on the rights of the individual judicial employee to associate freely with the private organizations such as are present here, and there is no question presented with respect to the employee's membership either in the NAACP or her neighborhood association. Here, as elsewhere, each described activity requires that we make a careful balance of "contesting constitutional interests." *State v. Williams*, 93 *N.J.* 39, 62 (1983). We believe that the constitutional interests are best served by the defined restrictions on public political activities of the subject court attendant. We have decided this case on the basis of the record before us related to public political activity. If there is a role as officer in the private organizations that petitioner can fulfill, not as advocate, leader, or spokesperson in the public forum, we will sympathetically evaluate the request. This case comes to us as a direct challenge to the application of our rule to a court attendant with the defined outside activities.[7] On the record before us, she may not continue as officer, trustee or member of the executive committee.

---

[7] We do not perceive this to be a case in which, in view of the apparent prestige, influence, and activity the employee may have in the organizations, the only role the employee may fulfill would be limited to payment of the

For now Mrs. Randolph must refrain from the subject public activities. As noted, Rule 1:17–1 does not apply to other employees of the sheriff's office. We are hopeful that accommodation of the petitioner's interests in remaining in other public office can be found in the vicinage by employment in another capacity by the Sheriff than that of a court officer or court attendant. In ruling as we do, we impose no "absolute prohibition upon the civic and community activities" of judicial employees as our dissenting members choose to suggest. *Post* at 468. Rather, we carefully balance the relationship of the employee to the judge against the nature of the political activity. In doing so, we adhere to the time-tested commitment of our judicial system to an integrity so austere that not only judges but "others officially associated with that court system have been *wholly divorced* from involvement in *partisan or other political activity*, as a necessary sacrifice for the sake of judicial integrity and the public appearance thereof." (Chief Justice Hughes in *In re Gaulkin, supra,* 69 *N.J.* at 189 (emphasis supplied)).

The Order of the Law Division is affirmed.

## APPENDIX

*Dixson v. United States,* 465 *U.S.* 482, 104 *S.Ct.* 1172, 79 *L.Ed.* 2d 458 (1984) (officers of a private, nonprofit corporation administering and expending federal community development block grants are "public officials" for purposes of the federal bribery statute); *National Wildlife Fed. v. Marsh,* 747 *F.*2d 616 (11th Cir.1984) (action to prohibit furtherance of city's redevelopment plan to insure that no less than 51% of funds would be used for activities which principally benefit persons of low and moderate income would be applied prospectively only to fiscal years subsequent); *Atkins v. Robinson,* 733 *F.*2d 318 (4th Cir.1984)

---

regular membership fee and attendance at membership meetings. There may be leadership roles in the private organizations that will not spill over into the public political arena. That issue is not before us.

(low-income black residents of county brought class action against county, county board of supervisors, and others, alleging that board's veto of proposed low-income housing development to be located in county and to participate in federal section eight housing assistance payment programs violated federal statutes and United States Constitution); *Citizens Coalition for Block Grant Compliance, Inc. v. City of Euclid,* 717 *F.*2d 964 (6th Cir.1983) (nonprofit civic corporation brought an action against the United States Department of Housing and Urban Development, a city, and others due to city's alleged failure to comply with and HUD's failure to ensure compliance with, city's fair housing obligations); *Tucson Community Dev. and Design Center, Inc. v. City of Tucson,* 131 *Ariz.* 454, 641 *P.*2d 1298 (Ct.App.1982) (taxpayer's petition for declaratory judgment with respect to acts of city and its mayor and council, which declared area of city blighted and established a redevelopment plan); *Kelso Corp. v. Mayor of Baltimore,* 45 *Md.App.* 120, 411 *A.*2d 691 (Ct.Spec.App.1980) (landowner's challenge to city's block grant plan); *Township Comm. of Edgewater Park v. Edgewater Park Housing Auth.,* 187 *N.J.Super.* 578. (Law Div.1982) (township committee brought suit seeking to restrain federally funded housing authority from carrying out any of its undertakings); *Township of Piscataway v. Concerned Citizens for Chronic Psychiatric Adults,* 200 *N.J.Super.* 615 (App.Div. 1985) (dispute over group home for psychiatric patients); *Mental Health Ass'n of Union County, Inc. v. City of Elizabeth,* 180 *N.J.Super.* 304 (Law Div.1981) (county mental health association brought action in lieu of prerogative writs against city and various city officials, seeking to enjoin defendants from interfering in any way with renovation and construction work on plaintiff's community residence); *Township of Washington v. Central Bergen Community Mental Health Center, Inc.,* 156 *N.J.Super.* 388 (Law Div.1978) (township's action to prevent use of residential premises by former mental patients); *Meglino v. Township Comm. of Eagleswood,* 197 *N.J.Super.* 296 (App.Div.1984) (property owner brought action

challenging township's method of financing and implementing low pressure sewer system along low-lying areas subject to tidal flooding); *McNally v. Township of Teaneck*, 75 *N.J.* 33 (1977) (property owners appealed from township's confirmation of special assessments imposed against their property for street improvements); *Gabriel v. Borough of Paramus*, 45 *N.J.* 381 (1965) (municipality could assess property for local improvement when plaintiffs' direct benefit resulted from interceptor sewer line (which tied into and was sole outlet of municipality's sewer system)); *Kastens v. Town of West New York*, 88 *N.J.Super.* 224 (App.Div.1965) (action by property owners to compel return of monies paid by them on account of local improvement assessment which had been set aside); *Csaki v. Township of Woodbridge*, 69 *N.J.Super.* 327 (Law Div.1961) (residents' challenge to sewer assessment); *Cirasella v. Village of South Orange*, 57 *N.J.Super.* 522 (App.Div.1959) (appeal by property owners from confirmation by trustees of village of an assessment levied by board of assessment); *Rutan Estates, Inc. v. Town of Belleville*, 56 *N.J.Super.* 330 (App.Div.), certif. den., 30 *N.J.* 601 (1959) (arbitrary and discriminatory and therefore unlawful to demand that the last remaining unserved parcel, representing a small fraction of the municipality's total area, pay for the extension of mains to serve it, and consequently portion of ordinance providing for such assessment was invalid); *Jardine v. Borough of Rumson*, 30 *N.J.Super.* 509 (App.Div.1954) (statute authorizing levies against all lands within a sewer district to meet expense of operation and maintenance of sewerage system was intended to require that tax be levied only upon property benefited by sewage system); *Sherman Holding Realty Corp. v. McGann*, 81 *N.J.Super.* 48 (Law Div.1963) (abutting owner challenged validity of a special assessment for street improvement).

POLLOCK, J., concurring in part and dissenting in part.

The majority and dissenting opinions agree that our endeavor is to strike a balance between two crucial, but contending, values: a public employee's constitutional rights of free speech

and association, and this Court's power to regulate the speech and conduct of employees associated with the judiciary. In striking that balance, the two opinions reach contradictory conclusions. The majority would not permit Mrs. Randolph to engage in any of her requested activities, but the dissent would permit her to engage in all of them.

In reaching opposite results, both the majority and the dissent draw upon the balancing test announced in *Pickering v. Board of Educ.,* 391 *U.S.* 563, 88 *S.Ct.* 1731, 20 *L.Ed.*2d 811 (1968), and refined in *Connick v. Meyers,* 461 *U.S.* 138, 103 *S.Ct.* 1684, 75 *L.Ed.*2d 708 (1983). I agree that the appropriate standard is the *Pickering* balancing test, but for me the proper balance rests between the polar positions of the majority and dissenting opinions.

Basically, I agree with the majority's formulation that the Court should recognize the difference between a judicial employee who is intimately involved in decision-making, such as a judge or a law clerk, and a court aide, such as Mrs. Randolph, who is not close to that process. *Ante* at 446. That difference becomes the mainstay of the dissent, which vigorously contends that a court aide "is not at all like a judge * * *." *Post* at 468.

Although court aides are employed by the county sheriff, they work in and around the courtroom. Through the discharge of their duties, court aides create the appearance that they are part of the judge's official family, an appearance that could lead a member of the public, such as a litigant, a witness, or a juror to conclude that the aides are involved in the decision-making process. Thus, we must be concerned with apparent, as well as actual, improprieties. To this extent, I disagree with the dissent, which suggests that a court aide's activities could never affect the public impression of judicial independence and impartiality. *Post* at 470.

A proper balance of interests should take into account that partisan political conduct poses more of a danger to judicial

independence than does non-partisan activity. Even non-partisan political conduct, however, can threaten that independence. Moreover, the closer any public office held by a court aide is to the inner-workings of government, the greater is the threat to the independence of the judiciary. As the majority recognizes, "[a]ppointment to any public office poses a greater likelihood of impermissible judicial involvement in other levels of government and the political process." *Ante* at 446.

Accordingly, I agree with the majority that Mrs. Randolph ought not serve on public bodies such as the Monmouth County Mental Health Board, the Freehold Borough Municipal Youth Guidance Council, the Freehold Borough Citizens' Participation Committee for HUD, or the Freehold Borough Board of Assessment. As the Administrative Office of the Courts advised Mrs. Randolph, "they are committees of other branches of government and they also involve a significant likelihood of involvement in political activity."

I would, however, permit her to continue to serve on the Executive Committee of the Red Bank Chapter of the National Association for the Advancement of Colored People (NAACP) and as second vice-president of the United Progressive Homeowners & Taxpayers Association, Inc. (Homeowners Association). In my judgment, her service on the executive committee of a local chapter of the NAACP does not "pose a realistic likelihood of compromising the independence of the judiciary." *Ante* at 447.

Her activities on behalf of the Homeowners Association present a closer case. She is the agent for the service of process on the Association and serves as the Association's spokesperson. Also, she participated in the early plans for leasing a school building to be used for a pre-school program, and she accompanied the Association's president when they met with a county official concerning the details for the lease. As troublesome as these activities may be, I find that they do not

pose a realistic likelihood of compromising judicial independence.

If she should escalate her activities in the private organizations to the point where those activities constitute such a threat, the Court may properly ask her to choose between continued employment and the private organizations. The dissent recognizes as much. *Post* at 467. Until then, I would not trench upon Mrs. Randolph's constitutional freedoms of speech and association by requiring her to resign as an officer of two private organizations.

GARIBALDI, J., dissenting.

Today, the majority holds that Norma Randolph, a $7,000-a-year court aide who is an employee of the Sheriff's Office, is prohibited by Rule 1:17–1 from exercising her First Amendment rights of freedom of speech and association because her activities in certain organizations constitute a threat to the impartiality and independence of the judiciary. As a matter of both constitutional law and public policy, I would allow Randolph to serve as well as to speak. Accordingly, I dissent.

## I

The constitutional basis for my position is found in the fundamental liberties protected by the First and Fourteenth Amendments of the United States Constitution and article one, paragraphs six and eighteen of the New Jersey Constitution (1947).

The First Amendment "was fashioned to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 *U.S.* 476, 77 *S.Ct.* 1304, 1 *L.Ed.*2d 1498 (1957). Furthermore,

[i]t is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.

[*NAACP v. Alabama,* 357 *U.S.* 449, 460, 78 *S.Ct.* 1163, 1171, 2 *L.Ed.*2d 1488, 1498 (1958).]

Similarly, article one, paragraphs six and eighteen of the New Jersey Constitution

> not only affirmatively guarantee[ ] to individuals the rights of speech and assembly, but also expressly prohibit[ ] government itself, in a manner analogous to the federal First and Fourteenth Amendments, from unlawfully restraining or abridging "the liberty of speech."
> [*State v. Schmid,* 84 *N.J.* 535, 560 (1980).]

In *Schmid,* moreover, we concluded that the State Constitution "serves to thwart inhibitory actions which unreasonably frustrate, infringe, or obstruct the expressional and associational rights of individuals...." *Id.* at 560.

In *NAACP v. Alabama,* the Supreme Court recognized that "[i]n the domain of these indispensable liberties, whether of speech, press, or association," abridgement even though unintended "may inevitably follow from varied forms of governmental action." 357 *U.S.* at 460, 78 *S.Ct.* at 1170, 2 *L.Ed.*2d at 1499.

Although the prohibition on encroachment of First-Amendment liberties is not absolute, the Supreme Court has held:

> It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny.... Thus encroachment "cannot be justified upon a mere showing of a legitimate state interest." The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest.
> [*Elrod v. Burns,* 427 *U.S.* 347, 362, 96 *S.Ct.* 2673, 2684, 49 *L.Ed.*2d 547, 559 (1976) (citations omitted).]

This Court likewise has held that restrictions on rights of speech and association are subject to strict judicial scrutiny. In *In re Hinds,* we held that such limitations must "further an important or substantial governmental interest unrelated to the suppression of expression," and "be no greater than is necessary or essential to the protection of the particular governmental interest involved." 90 *N.J.* 604, 614 (1982). *See In re Rachmiel,* 90 *N.J.* 646, 655 (1982).

Nor may an individual, by virtue of being a public employee, be deprived of his or her constitutional right to freedom of expression and association. *Connick v. Myers,* 461 *U.S.* 138, 142, 103 *S.Ct.* 1684, 1687, 75 *L.Ed.*2d 708, 716–17 (1983); *Bran-*

*ti v. Finkel*, 445 *U.S.* 507, 100 *S.Ct.* 1287, 63 *L.Ed.*2d 574 (1980); *Perry v. Sindermann*, 408 *U.S.* 593, 92 *S.Ct.* 2694, 33 *L.Ed.*2d 570 (1972); *Pickering v. Board of Educ.*, 391 *U.S.* 563, 88 *S.Ct.* 1731, 20 *L.Ed.*2d 811 (1968); *Keyishian v. Board of Regents*, 385 *U.S.* 589, 87 *S.Ct.* 675, 17 *L.Ed.*2d 629 (1967). Long gone are the days when the Supreme Court held that government could condition public employment on the surrender of certain constitutional rights. *See Adler v. Board of Educ.*, 342 *U.S.* 485, 72 *S.Ct.* 380, 96 *L.Ed.* 517 (1952); *Garner v. Los Angeles Board of Pub. Works*, 341 *U.S.* 716, 71 *S.Ct.* 909, 95 *L.Ed.* 1317 (1951); *United Pub. Workers v. Mitchell*, 330 *U.S.* 75, 67 *S.Ct.* 556, 91 *L.Ed.* 754 (1947); *United States v. Wurzbach*, 280 *U.S.* 396, 50 *S.Ct.* 167, 74 *L.Ed.* 508 (1930); "Developments in the Law—Public Employment," 97 *Harv.L.Rev.* 1611, 1739 (1984).

The Supreme Court, however, recognizes that the state has a legitimate interest as an employer in regulating the speech and acts of its employees. Accordingly, in *Pickering v. Board of Educ.*, 391 *U.S.* at 568, 88 *S.Ct.* at 1734, 20 *L.Ed.*2d at 817, it established a balancing test to determine whether in furthering that interest a public employer has violated its employees' First-Amendment rights. The court must balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*[1]

## II

In applying the *Pickering* framework, one first must analyze the interests of the employee, as a citizen, in commenting upon matters of public concern. This requires consideration of the

---

[1]The Supreme Court's 5–4 decision in *Connick v. Myers*, 461 *U.S.* 138, 103 *S.Ct.* 1684, 75 *L.Ed.*2d 708 (1983), limited the scope of public employees' expressional rights to those that address a public concern. Here, the majority agrees that the rights asserted by Norma Randolph are of public concern. Hence, the limitation imposed on the *Pickering* doctrine by *Connick* is not applicable here.

nature of the activity prohibited by the rule. "The more the subject matter of the employee's expression implicates core first amendment values, the greater is the government's burden in justifying its regulation." Note, "Politics and the Non-Civil Service Public Employee: A Categorical Approach to First Amendment Protection," 85 *Col.L.Rev.* 558, 571 (1985). It is undisputed that Norma Randolph's rights to free speech and association are core First Amendment rights. Here "we are not quibbling over fine-tuning of prophylactic limitations but are concerned about the wholesale restriction of clearly protected conduct." *FEC v. National Conservative PAC,* 470 *U.S.* ——, ——, 105 *S.Ct.* 1459, 1471, 84 *L.Ed.*2d 455, 472 (1985).

Randolph's activities fall into two categories: (1) public appointee positions on various community boards and councils, and (2) offices in two non-profit private community organizations. Specifically, the public positions concern the Monmouth County Mental Health Board (of which Randolph is no longer a member), the Freehold Borough Board of Assessment, the Borough of Freedom Youth Guidance Council, and the Citizens Participation Group of Freehold Borough. Additionally, Randolph serves on the Executive Committee of the Greater Red Bank Chapter of the National Association for the Advancement of Colored People (NAACP), and is second vice-president of the United Progressive Homeowners and Taxpayers Association, Inc. (UPH).

The Court does not distinguish between Randolph's activities in the public and private organizations, but prohibits her activities in all of the organizations for the same reason—namely, that these activities pose a realistic likelihood of involving the judicial employee in important and recurring public issues that are the frequent subject of political controversy, giving the impression of judicial involvement in those issues and creating the appearance of a judiciary lacking in impartiality and independence. The majority concludes that the speech and association of judicial employees may be restricted if there is a realistic likelihood of interference with or disruption of the

administration of the courts' services, and finds that Randolph's activities constitute a realistic likelihood of such a disruptive effect upon the work of the judiciary.

It is important to understand what this case does not concern. It does not concern traditional political activity. Not one of the organizations works for or advises political candidates or is involved in partisan politics.[2] Here the majority does not limit Randolph's activities because the organizations actually engage in "political activity," but rather prohibits her from serving in civic and community organizations that have a *potential* to be involved in public controversy. This sort of speculation amounts to an outright prohibition of services in any civic or community organization,[3] since by definition such an orga-

---

[2]Two leading cases in which the Supreme Court has addressed the constitutionality of statutes restricting the political activity of public employees are *Broadrick v. Oklahoma,* 413 *U.S.* 601, 93 *S.Ct.* 2908, 37 *L.Ed.*2d 830, and *United States Civil Serv. Comm. v. National Ass'n of Letter Carriers,* 413 *U.S.* 548, 93 *S.Ct.* 2880, 37 *L.Ed.*2d 796 (1973). Although the Court upheld the challenged statute in each instance, it is clear from these decisions that the government's ability to restrict the political activities of its employees is extremely limited. As noted by the Third Circuit:

> We think * * * that *Broadrick* and *Letter Carriers,* properly viewed, carve out carefully circumscribed exceptions to the sweeping injunction of the First Amendment, exceptions allowing a legislature—Congress or state lawmakers—to inhibit *only* "partisan political activity" and not all political "discussion."
> [*Alderman v. Philadelphia Housing Auth.,* 496 *F.*2d 164, 172 (3d Cir.1974) (emphasis in original).]

While the present case does not concern a public employee's right to participate in either partisan or nonpartisan elections, these precedents demonstrate how narrowly the Supreme Court construes the government's ability to prohibit its employees from engaging in traditional "political activity."

[3]Such speculation also results in an uneven application of the Rule 1:17–1. In the past, employees of the Administrative Office of the Courts and supporting judicial personnel have been permitted to serve on the New Jersey Advisory Commission for the U.S. Commission on Civil Rights; on the board of directors for the New Jersey Association for Retarded Citizens; as second vice-president for the Tenby Chase Civic Association, a local homeowners

nization deals with issues of public concern. In short, if all issues of public concern are classified as "political activity," then no civic involvement is permitted.

And so, this interpretation effectively precludes any employee covered by Rule 1:17–1 from actively participating in any community or civic organization. Indeed, under a literal application of the majority's test, a judicial employee, regardless of his or her position, could not serve as an officer in a religious organization, a parents-teachers association, or neighborhood environmental group. After all, there is a realistic likelihood that activities in any of those organizations will involve the judicial employee in important and recurring public issues that are the frequent subject of public controversy. Moreover, although the majority seemingly holds that Randolph may continue as a member of the NAACP and UPH, the reasons for prohibiting her from serving as an officer of the organization are equally applicable to preventing her from being an active member of the organization. Given her thirty years of exemplary community service, it is unlikely that, unrestrained, she would ever be a passive member of any organization to which she belongs.

The Court also fails to recognize that while Rule 1:17–1 imposes an absolute ban on an employee engaging in "political activity," it does not impose an absolute ban on an employee serving in an appointive position; instead it vests this Court with discretion to grant or deny permission to an employee to hold any other public office, position or employment. The majority claims that "[r]ealistically, such appointments come

organization; on the executive committee of the Educational Rights Association; as a trustee of the Bergen Community Regional Blood Center; as a member of the Citizens' Advisory Commission at Mercer County Community College; and as a trustee of Rutgers University. Permission was denied to serve on the board of directors of the Trenton Chapter of the Urban League; as chairman of the board of trustees of Gloucester County College; on the board of directors of the Jewish Hospital and Rehabilitation Center; and as alternate member of the Elizabeth Fair Rental Housing Board.

about through politics in the broader sense." *Ante* at 445. Ergo, any judicial employee is automatically prohibited from serving on such a governmental board or commission. But this Court's discretionary authority itself belies the majority's position. There may be cases where regular consistent activities in traditional politics leading up to the appointment may result in this Court's denying permission for a judicial employee to serve on a governmental board. The record in this case discloses no evidence of this type. There is no suggestion that Randolph ever engaged in any partisan political activities, let alone that such activities resulted in her appointments to the governmental boards. For all the Court's avowals of "realism," it overlooks the overriding reality to which the record points: that Randolph's appointments to four governmental boards were not at all akin to the political plums of patronage that would compromise the integrity of the judicial system. Rather, the appointments are those positions usually given to concerned citizens of a community interested in helping all the citizens, but particularly the mentally ill, the young, and the disadvantaged.

The majority's interpretation not only violates an employee's First Amendment rights of freedom of association and speech; it also is an unwarranted extension of the original meaning of the rule. The source rule from which Rule 1:17–1 has evolved is *R.R.* 1:25C, which had been adopted in 1961. When the present rule was adopted in 1969, the prohibition in the previous rule against "partisan political activity" was amended to prohibit "political activity." The purpose of that change was explained by its drafters in the "Comments on Rule 1:17–1" as follows:

> The introductory sentence of this rule substitutes the phrase "political activity" for "partisan political activity" in the source rule. The word "partisan" has been dropped since the Supreme Court has interpreted the present rule as barring those persons covered thereby from being active in non-partisan political elections.

Although I believe that the change was intended merely to clarify that the rule applied to all types of elections, whether

partisan or nonpartisan, I recognize that under Rule 1:17–1 the term "political activity" may encompass more than traditional electoral political activity. In certain instances, depending on a court employee's position in the judiciary, his or her leadership role in a community activity may be so controversial and so antithetical to the independence and integrity of the judiciary that the employee should be forbidden to continue that role or even participation in any capacity. However, such a conclusion should be reached only after a thorough and vigorous analysis of the employee's activity, his or her position in the judiciary, and the impact of the challenged actions on the judiciary. Otherwise, we merely pay lip service to the *Pickering* analytical framework, too readily allowing the State's admittedly real but unfocused interest in averting threats to the independence and impartiality of the judiciary to outweigh the citizen's core First Amendment rights.

### III

On the other side of the *Pickering* balance, one must analyze the interest of the State as an employer that is invoked to justify the restriction upon the citizen-employee's rights of speech and association, along with the fit between this end and the means chosen to further it. Here I do not find that the prohibition of Randolph's activities is necessary or essential to further any important or substantial governmental interest.

To be sure, the judiciary has an interest in maintaining its independence and impartiality. We have held that judges and others officially associated with the court system must be divorced from involvement in the political sphere, "as a necessary sacrifice for the sake of judicial integrity and the public appearance thereof." *In re Gaulkin,* 69 *N.J.* 185, 189 (1976).

This separation is thought in this State * * * to be indispensable to public confidence in the courts and their probity, impartiality, disinterested objectivity and freedom from outside pressures in their dealing with causes coming before them. Such public confidence in judicial integrity is the foundation * * * of our

courts' power, influence and acceptance as necessary instruments in the effective administration of justice. [*Id.*]

Nevertheless, our interest in preserving the integrity of the judicial system must be balanced against a public employee's right to exercise his or her First Amendment rights. Any restriction imposed may not be greater than that which is necessary or essential to protect the governmental interest. Thus, in *In re Gaulkin*, we held that, subject to certain limitations, the prohibition against political activity on the part of a judge should not extend to his or her nonjudicial spouse. "Where a court is dealing with a First Amendment right (here the political involvement of the non-judicial spouse), fears that its exercise will have undesirable consequences cannot inhibit judicial vindication thereof." *Id.* at 198.

I acknowledge that some restrictions upon the political activities of an employee may further an important governmental interest. However, there is no valid justification for an absolute prohibition upon the civic and community activities of court employees, particularly those who are as far removed from the judicial decision-making process as is Randolph. The impact on the independence of the judiciary by the activities of a judge who exercises discretionary powers is radically different from the impact by the activities of an employee who performs ministerial tasks. In applying the balancing test, the majority ignores this difference. One reading the opinion of the Court might infer that Randolph's duties are similar to those of a judge.

But Randolph is not at all like a judge; she is a court aide, employed by the Sheriff's Office of Monmouth County at a salary of $7,000.[4] She wears a uniform that identifies her as

---

[4]Randolph also argues that as an employee of the Sheriff's Department, she falls within the category of persons exempted from Rule 1:17–1 under Rule 1:17–2, which provides:

*Rule 1:17–1 shall not apply to* county clerks, county prosecutors, *sheriffs nor to employees of their respective offices except as such employees are*

courtroom personnel. Her duties include the following: swearing in witnesses, taking juries up and down stairs, preparing the courtroom with water pitchers and chairs, and occasionally announcing entrances and exits of the judge. She has never received a direct order from a judge. She takes her orders from a co-worker, a more experienced employee of the Sheriff's Department who is a court attendant. Significantly, on the basis of a factual hearing below, the court found that Randolph does *not* engage in any of the following duties:

(i) attend the judge on the bench or in chambers, answer the telephone, obtain law books, procure documents or records;

(ii) see that counsel, court clerk, court reporter or other necessary personnel are present before the judge leaves his chambers;

(iii) call trial lists, announce postponements or adjournments; or

(iv) supply information personally or by telephone to attorneys, prosecutor, sheriff, or other county officials as to trial, motion, dismissal lists, adjournments, current status or disposition of cases.

A review of Randolph's duties indicates that, unlike a judge's secretary or law clerk, she has neither close contact nor a close personal relationship with the judge. Court aides are not considered personal aides to judges, and judges are discouraged from treating court aides as such. They are uniformed personnel assigned by the sheriff to various courtrooms, not to a particular judge. They perform important, necessary ministerial functions, but they are not involved in the decision-making process of the court.

This analysis of the position of judicial employees is not meant to demean or denigrate the job of any judicial employee,

---

*specifically referred to therein* and except as otherwise provided by N.J.S. 2A:158–21 (proscribed political activity of county prosecutors and their staffs). [emphasis added.]

Randolph argues that if we held in *Clark v. DeFino,* 80 *N.J.* 539 (1979), that Rule 1:17–1(a) and (b) were insufficient to overcome the exemption as to surrogates, it should follow that the general language of Rule 1:17–1(f) is insufficient to overcome the exemption as to sheriff's employees. Thus, Rule 1:17–1 is inapplicable. I disagree with this contention and find that if a court aide has sufficient contact with the court system, he or she may be bound by Rule 1:17–1.

but rather to point out that certain positions are more central and sensitive to the decision-making process of the judiciary than others. The functions of Randolph and the functions of a judge with respect to their impact on the independence and impartiality of the judiciary and the public's perception of their impact are totally different.

While those in a position to affect decision-making or to influence the public's confidence in the judiciary must maintain their independence and impartiality, restraints upon the civic and community activities of court employees who are so far removed from the judicial decision-making process as Norma Randolph are not warranted. Prohibiting Randolph from serving in either the public or private organizations with which she is affiliated goes far beyond protecting the integrity of the judiciary. The majority has unrealistically imposed on Randolph requirements that should be reserved for judges and other people who are in a position to influence judges or the administration of justice. I simply do not believe the public perceives that court aides who are assigned randomly to court-rooms to perform administrative tasks influence the legal decisions of the judges who sit within them.

Certainly, it is less troublesome for the Court to issue as it does today an absolute prohibition on its employees and other judiciary support personnel from actively participating in any organization that is concerned with public issues. However, the First Amendment does not permit such a blanket prohibition. Any restrictions must be based upon realistic appraisals of substantial harm to the government. Such appraisals have not been made here. The majority's opinion makes only vague references to the harm that will be done to the judiciary by Randolph's participation in these activities:

> We do not believe that we must prove beyond debate that this detachment is necessarily lost, or that litigants will start to think that a judge will be partial to a particular group or philosophy because of association with politically-active court personnel. More is at stake here than proof of prejudice. We think that there is a much more subtle value involved, and do not think the Constitution prevents us from promoting such values, even if they are difficult to describe or

> prove, so long as they represent something very important. There is a tone, a feeling, an atmosphere, of impartiality that should surround everything that has to do with the judiciary. That subtle value is destroyed or damaged each time that someone connected with the courts does something that judges should not do even though they are not judges. [*Ante* at 452–53.]

The majority does not apply the *Pickering* balancing test in a reasonable, common-sense manner. In actuality, the interest of the judiciary here is slight when weighed against Mrs. Randolph's protected forms of expression.

Although the majority claims to eschew an absolutist approach (either on the side of protecting expression and association or restricting it) for a balancing approach, it invokes Chief Justice Weintraub for the proposition that "[t]he prohibition on political activity is absolute," *ante* at 441, and that "[t]he relevant factor is ... she has been assigned by the Sheriff to the courtroom."[5] *Ante* at 452. Furthermore, the majority

---

[5]The Court takes issue with my suggestion that it adopts an absolutist approach instead of applying the *Pickering* balancing framework, apparently qualifying its otherwise practically absolutist approach with the concession that "[i]f there is a role as officer in the private organizations that petitioner can fulfill, not as advocate, leader, or spokesperson in the public forum, we will sympathetically evaluate the request." *Ante* at 454. This is no concession at all, for it does not necessarily manifest a balancing approach. *Any* "absolutist" approach will admit of exceptions, if only in the sense of requiring judgments in defining the range of absoluteness—here, for example, in determining the boundary between "private organization" and "public forum." And, given the majority's analysis throughout the rest of the opinion, it is hard to imagine what role as officer in such "private" civic and community organizations would survive its supposedly sympathetic evaluation—unless, ironically, that role were to discharge the very sort of duties Randolph performs as court officer.

A final point should be noted. *Pace* the Court's suggestion, this case "comes to us as a direct challenge to the application of our rule to a court attendant with the defined outside activities." *Ante* at 454. On June 16, 1983, this Court ordered that the petition for review in this case be granted and that the matter be temporarily remanded to the Assignment Judge of Monmouth County to designate a judge to conduct a hearing and ordered that the judge make recommended findings of fact on the nature of the organizations involved, the activities and relationship of Norma Randolph with those organizations and the duties and activities of Norma Randolph as a court aide. The hearing was held on October 21, 1983 before a judge of the Superior Court of Monmouth

claims to have distilled from various decisions and principles "a flexible rule that is tailored to the relationship or proximity of the employee to the decision-making and to the nature and extent of the political activities sought to be engaged in by the employee." *Ante* at 441. With all due respect, I submit that the Court inflexibly applies an absolute rule, failing to tailor it to the first of these two enunciated factors. A court attendant like Randolph, conceding her association with organizations concerned with public issues that are likely to be the subject of judicial resolution, nonetheless is not close enough or so related to a judge as to give the appearance of a judiciary lacking in impartiality on these issues. The "appearance of impropriety," while real and subtle, threatens to become an insubstantial and fanciful specter in the majority's analysis. And so, the majority, in being "unique[ly] committed" to the actual and apparent independence of court employees, is less protective of their constitutional rights to expression and association than is the balancing framework of *Pickering* and *Connick*. It lays aside our State's proud tradition of "exceptional vitality in the New Jersey Constitution" with respect to these constitutional rights, indeed of being more protective of such rights than is the United States Constitution. *State v. Schmid*, 84 *N.J.* 535, 557 (1980). The Court's bright-line approach obscures its encroachment upon constitutional rights to freedom of expression and association.

## IV

Furthermore, the majority did not consider the least intrusive means to achieve the intent of Rule 1:17–1. *Shelton v. Tucker*, 364 *U.S.* 479, 488, 81 *S.Ct.* 247, 252, 5 *L.Ed.*2d 231, 237 (1960). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow

County, who made the recommended findings of fact, which along with facts added by petitioner form the record in this case.

specificity." *NAACP v. Button,* 371 *U.S.* 415, 433, 83 *S.Ct.* 328, 338, 9 *L.Ed.*2d 405, 418 (1963).

[A] State may not choose means that unnecessarily restrict constitutionally protected liberty. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties. [*Elrod v. Burns,* 427 *U.S.* 347, 363, 96 *S.Ct.* 2673, 2684, 49 *L.Ed.*2d 547, 559 (1976) (citations omitted).]

The restrictions imposed on the clerks of the federal courts, who have a closer relationship with the judges of those courts than does Randolph with state court judges, offer a telling contrast. Canons 5B and 7B of the Code of Conduct for United States Clerks provide as follows:

Canon 5B. *Civil and Charitable Activities.* A clerk may participate in civic and charitable activities that do not detract from the dignity of his office or interfere with the performance of his official duties. A clerk may serve as an officer, director, trustee or advisor of a civic or charitable organization and solicit funds for any such organization, subject to the following limitations:

(1) He should not use or permit the use of the prestige of his office in the solicitation of funds.

(2) He should not solicit his subordinates to contribute to or participate in any civic or charitable activity, but he may call his subordinates' attention to a general fund-raising campaign such as the Combined Federal Campaign or the United Way.

(3) He should not solicit funds from lawyers or persons likely to come before him or the court which he serves.

Canon 7B. *Nonpartisan Political Activity.* A clerk may engage in nonpartisan political activity that does not tend to reflect adversely on the dignity of the court or his office, or interfere with the proper performance of his official duties.

[Vol. I–C Guide to Judiciary Policies and Procedures, Ch. X Personnel Regulations, Part J Code of Conduct for United States Clerks (March 14, 1979).6]

A reading of these federal guidelines suggests that the Court could resort to other less restrictive measures to effectuate the primary aim of protecting the integrity and independence of the judicial system.

---

6On April 28, 1983, Canon 5B was amended as follows: "a civic or charitable organization" was changed to "an educational, religious, charitable, fraternal, or civic organization." On May 19, 1983, the Code was amended in other respects.

Rather than resort to the imposition of a blanket ban against community and civic involvement, another less drastic means would be for the Court to adopt in fact as well as in name the *Pickering* approach, directing that actual or perceived conflicts be resolved as they arise. For example, while it is possible, although highly unlikely, that any one of these organizations may become involved in litigation and be assigned to the same court to which Norma Randolph is also assigned, it would be a simple administrative matter to have her temporarily reassigned to a different courtroom. If a serious conflict arose, the Court could at that time balance the purposes and policies to be served by a proscription against Randolph's continued involvement in the organization. Measures like these would be adequate to protect the public's confidence in the judiciary, while preserving Randolph's fundamental First Amendment rights.

## V

"It goes without saying that our system of government is predicated upon the premise that every citizen shall have the right to engage in political activity. It is a basic freedom enshrined in the First Amendment." *In re Gaulkin,* 69 *N.J.* at 191. This important right must be relinquished by our judges upon ascendancy to the bench. *Id.* However, no justification exists for adherence to a prophylactic policy so fixed as to preclude Norma Randolph, an outstanding citizen devoted to serving her community, from exercising her right to participate in her community's activities as she has done in the past. Certainly, a mere allegation that an organization committed to benefiting the community may have a *potential* for public controversy is not a sufficient basis on which to curtail Randolph's First Amendment rights. Under the *Pickering* balancing test, the judiciary's interest in Randolph's right to engage in activities that do not constitute traditional electoral political activity is minimal. In contrast, Randolph's rights are fundamental and compel this Court's vigilant protec-

tion.  The judiciary's interest is adequately protected by judging the restrictions on civic participation according to an employee's duties in the court system.

POLLOCK, J., concurring in the result.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, POLLOCK and O'HERN—5.

*For reversal*—Justices HANDLER and GARIBALDI—2.